REVISED AUGUST 16, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-60742
_____


THOMAS E. WALTON; LE'ELLEN WALTON,

                                        Plaintiffs-Appellees,

                         v.

ROSE MOBILE HOMES LLC; ET AL.,

                                        Defendants,

SOUTHERN ENERGY HOMES, INC.,

                                        Defendant-Appellant.

_____

              Appeal from the United States District Court
                for the Southern District of Mississippi


_____
                          July 30, 2002
Before KING, Chief Judge, and JOLLY and EMILIO M. GARZA, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

     Defendant-Appellant Southern Energy Homes, Inc. appeals the

district court's denial of its motion to compel arbitration of the

Waltons' claim for breach of express written warranty under the

Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-12 (1994).  For the

following reasons, we REVERSE.

I

In January 1999, Plaintiffs-Appellees Thomas and Le'Ellen Walton ("the Waltons") purchased a mobile home manufactured by Defendant-Appellant Southern Energy Homes, Inc. ("Southern Energy") from a retail seller, Rose Mobile Homes ("Rose"). Southern Energy issued the Waltons a one-year manufacturer's warranty against defects in materials and workmanship.  This warranty contained an arbitration provision requiring the Waltons to submit any claims under the warranty to binding arbitration.[1]

The Waltons discovered a variety of defects in their mobile home.  They requested repairs from both Southern Energy and Rose on numerous occasions, but these repairs never were completed to the Waltons' satisfaction.  Consequently, in October 1999, the Waltons revoked their acceptance of the mobile home by letter.

---

[1]The sales contract also contained a binding arbitration provision that stated: "[A]ny controversy or claim . . . arising out of or relating to this Contract or any agreements or instruments relating to or delivered in connection with this Contract . . . shall . . . be determined by arbitration, reference, or trial by a judge as provided below.  A controversy involving only a single claimant, or claimants who are related or asserting claims arising from a single transaction, shall be determined by arbitration [pursuant to the Federal Arbitration Act]."  Separate and apart from the warranty and the sales contract, Thomas Walton also signed a "Binding Arbitration Agreement" at the time of sale. This agreement stated: "All disputes . . . resulting from or arising out of the design, manufacture, warranty or repair of the manufactured home . . . will be submitted to BINDING ARBITRATION [pursuant to the Federal Arbitration Act]."

2

In December 1999, the Waltons filed suit against Southern Energy and Rose[2] in the Circuit Court of Kemper County, Mississippi, alleging negligence, breach of contract, breach of express and implied warranties, and violation of the Magnuson-Moss Warranty Act (the "MMWA").[3] The defendants removed the case to federal district court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and the MMWA's jurisdictional provision, 15 U.S.C. § 2310(d).

Both Southern Energy and Rose filed motions to compel arbitration of the Waltons' claims. They contended that the arbitration provisions in the warranty and sales contracts and the separate "Binding Arbitration Agreement" signed by Thomas Walton at the time of sale are valid and enforceable under the Federal Arbitration Act (the "FAA") with respect to all of the Waltons' claims. In response, the Waltons argued that the MMWA precludes the enforcement of binding arbitration provisions contained in express written warranties. The Waltons maintained that, because of this statutory prohibition, neither their warranty claims under the MMWA nor their related state law claims are subject to

---

[2]The Waltons also named Greenpoint Financial Corporation (the company that financed the purchase) as a defendant in the lawsuit, arguing that the failure of the mobile home purchase gives the Waltons a defense to Greenpoint's secured claim against them. This issue is not before this court.

[3]The MMWA establishes standards governing the content of consumer product warranties, see 15 U.S.C. §§ 2301-08 (1994), and creates a legal remedy for consumers who are harmed by a warrantor's failure to comply with the obligations established in a warranty, see id. § 2310. Both parties agree that the MMWA's provisions are applicable to the transaction at issue.

3

compulsory arbitration. A federal magistrate judge agreed with the Waltons and denied Southern Energy and Rose's motions to compel arbitration with respect to all of the Waltons' claims.

Upon review of the magistrate judge's order, the district court agreed with the magistrate judge's conclusion that the MMWA precludes Southern Energy (the warrantor) from requiring the Waltons to submit their written warranty claims to binding arbitration. Contrary to the magistrate judge's conclusion, however, the district court compelled arbitration of the Waltons' claims that did not arise under the MMWA. Thus, the district court ordered the Waltons to submit their negligence, breach of contract and breach of implied warranty claims to arbitration.[4] Southern Energy now appeals the district court's denial of its motion to compel arbitration of the Waltons' MMWA claim.

## II

We review a district court's grant or denial of a motion to compel arbitration de novo. Webb v. Investacorp, Inc., 89 F.3d 252, 257 (5th Cir. 1996). We have determined that a two-step inquiry governs the adjudication of motions to compel arbitration under the FAA: "The first step is to determine whether the parties agreed to arbitrate the dispute in question. . . . The second step is to determine whether legal constraints external to the parties'

---

[4]Because Rose issued no express written warranty to the Waltons, all claims against Rose were deemed subject to arbitration. Accordingly, Southern Energy is the only remaining defendant in this action.

4

agreement foreclosed the arbitration of those claims." Id. at 257-58 (internal citations and quotations omitted). Because neither party disputes that the warranty contains a valid arbitration agreement that encompasses the Waltons' breach of express warranty claim, we focus our attention on the second step of the Webb inquiry: whether the MMWA presents a legal constraint that forecloses arbitration of the express warranty claim.

We first consider the background and dictates of the Federal Arbitration Act, and then of the Magnuson-Moss Warranty Act.

A

The Federal Arbitration Act was enacted in 1924 to "revers[e] centuries of judicial hostility to arbitration agreements by plac[ing] arbitration agreements upon the same footing as other contracts." Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 225-26 (1987) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11 (1974)) (internal citations and quotations omitted, alterations in original). The FAA provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1994).

There is a "liberal federal policy favoring arbitration," and the Supreme Court has read the FAA to establish a presumption in favor of the enforceability of contractual arbitration agreements. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). The presumption of enforceability of arbitration agreements applies equally to "claim[s] founded on statutory rights." McMahon, 482 U.S. at 226. Only a contrary congressional command can override the dictates of the FAA. Id.

In order to overcome this presumption in favor of arbitration, the party opposing arbitration bears the burden of demonstrating that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." Id. (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)). Courts consider three factors in determining whether Congress intended to preclude application of the FAA to a particular statutory right: (1) the statute's text; (2) its legislative history; and (3) whether there is "an inherent conflict between arbitration and the statute's underlying purposes." Id.

In every case the Supreme Court has considered involving a statutory right that does not explicitly preclude arbitration, it has upheld the application of the FAA. This includes cases falling under the Age Discrimination in Employment Act,[5] Sherman Act,[6]

---

[5]Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991).

[6]Mitsubishi Motors, 473 U.S. at 628-40.

6

Racketeer Influenced and Corrupt Organization Act,[7] Securities Act of 1933,[8] Securities Exchange Act of 1934,[9] and the Truth in Lending Act.[10]

B

We now turn to the provisions of the Magnuson-Moss Warranty Act ("MMWA"). The MMWA was enacted in 1974 to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 U.S.C. § 2302(a). In addition to establishing standards governing the content of warranties, the MMWA creates a statutory cause of action for consumers "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty, implied warranty, or service contract." Id. § 2310(d)(1).[11] Suits under the MMWA may be brought in either federal or state court, id., and consumers are permitted to recover reasonably-incurred

---

[7]McMahon, 482 U.S. at 242 (civil RICO claims).

[8]Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484-86 (1989), overruling Wilko v. Swan, 346 U.S. 427 (1953).

[9]McMahon, 482 U.S. at 238.

[10]Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 88-92 (2000).

[11]The MMWA also empowers the Attorney General and the Federal Trade Commission to initiate proceedings for deceptive warranty or noncompliance with the requirements of the Act. See 15 U.S.C. § 2310(c).

7

costs and expenses, including attorneys' fees, if they prevail in such suits.  Id. § 2310(d)(2).

Before bringing a suit for breach of warranty, the consumer must give persons obligated under the warranty a reasonable opportunity to "cure" their failure to comply with the obligations at issue.  Id. § 2310(e).  The MMWA also permits warrantors to establish "informal dispute settlement procedures" for breach of written warranty claims, and to require consumers to resort to such procedures before bringing a civil action.[12]  Id. § 2310(a).  While the term "informal dispute settlement procedure" is not defined anywhere in the text of the Act, the Federal Trade Commission (the "FTC") is instructed to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty."  Id. § 2310(a)(2).  If a warrantor establishes an informal dispute settlement procedure in accordance with the FTC rules, the warrantor is permitted to include language in the warranty requiring consumers to resort to this procedure "before pursuing any legal remedy" under the Act.  Id. § 2310(a)(3)(C).  The FTC has adopted a regulation stating that informal dispute settlement

---

[12]The provisions of the MMWA governing informal dispute settlement procedures appear to be applicable only to claims brought pursuant to written warranties.  See 15 U.S.C. § 2310(a)(2) (1994) ("The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this chapter applies.") (emphasis added).

8

procedures under the MMWA cannot be legally binding on any person. See 16 C.F.R. § 703.5(j). The FTC therefore has found that written warranties cannot require binding arbitration. 40 Fed. Reg. 60168, 60211 (1975) ("[T]here is nothing in the Rule which precludes the use of any other remedies by the parties following a Mechanism decision . . . . However, reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act.") Thus, according to the FTC's interpretation, binding arbitration is simply impermissible under the MMWA.

## III

When we review an agency's construction of a statute that it administers, we must defer to that agency's interpretation of the statute if: (1) Congress has not spoken directly to the issue; and (2) the agency's interpretation "is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent . . . . If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id. at 843 n. 9.

There is no doubt that Congress has expressed a clear intention in favor of arbitration for contractual claims. See 9 U.S.C. § 2 ("A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.") We therefore must determine if Congress expressed any contrary intent with respect to such claims arising under the MMWA.

A

Under McMahon, in order to determine if Congress intended to preclude arbitration of a statutory claim, we consider the statute's text, its legislative history, and its purpose. McMahon, 482 U.S. at 226. The text of the MMWA does not specifically address binding arbitration, nor does it specifically allow the FTC to decide whether to permit or to ban binding arbitration. Although the MMWA allows warrantors to require that consumers use "informal dispute settlement procedures" before filing a suit in court, and allows the FTC to establish rules governing these procedures, it does not define "informal dispute settlement procedure." However, the MMWA does make clear that these are to be

10

used <u>before</u> filing a claim in court. Yet binding arbitration generally is understood to be a <u>substitute</u> for filing a lawsuit, not a prerequisite. See <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.")

In <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20 (1991), the Court held that the Age Discrimination in Employment Act ("ADEA") does not preclude compulsory arbitration of ADEA claims, even though the ADEA allows the EEOC to pursue "'informal methods of conciliation, conference, and persuasion.'" <u>Id.</u> at 29 (quoting 29 U.S.C. § 626(b)). Therefore the availability of informal methods of settling a dispute plainly does not itself preclude the availability of arbitration. Further, the fact that the MMWA creates a judicial forum for MMWA claims is insufficient evidence of congressional intent to preclude application of the FAA. See <u>McMahon</u>, 482 U.S. at 227 (finding that a provision of the Securities Exchange Act stating that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title" did not preclude application of the FAA to claims brought under the statute) (quoting 15 U.S.C. §

11

78aa); <u>Gilmer</u>, 500 U.S. at 29 (rejecting the argument that compulsory arbitration under the ADEA is improper because the statute provides claimants with a judicial forum); <u>Matsushita Elec. Indus. Co. v. Epstein</u>, 516 U.S. 367, 385 (1996) ("[A] statute conferring exclusive federal jurisdiction for a certain class of claims does not necessarily require resolution of those claims in a federal court."). In short, the availability of a judicial forum is no basis for precluding arbitration of claims under the MMWA.

We also note that binding arbitration is not normally considered to be an "informal dispute settlement procedure," and it therefore seems to fall outside the bounds of the MMWA and of the FTC's power to prescribe regulations. We thus conclude that the text of the MMWA does not evince a congressional intent to prevent the use of binding arbitration.

B

We next consider the legislative history of the MMWA. The legislative history does not specifically discuss the availability of arbitration, nor does it define or shed light on the meaning of "informal dispute settlement procedure." The legislative history does indicate that such procedures were meant to be non-binding. For example, the House Report on the MMWA states that "[a]n adverse decision in any informal dispute settlement procedure would not be a bar to a civil action on the warranty involved in the proceeding . . . ." H.R. Rep. No. 93-1107 (1974), <u>reprinted in</u> 1974

12

U.S.C.C.A.N. 7702, 7723. The Conference Committee report also indicates that if a consumer chooses not to pursue an informal dispute settlement procedure, a consumer can still pursue "all alternative avenues of redress." S. Conf. Rep. No. 93-1408 (1974), reprinted in 1974 U.S.C.C.A.N. 7755, 7758. However, there is still no evidence that Congress intended binding arbitration to be considered an informal dispute settlement procedure. Therefore the fact that any informal dispute settlement procedure must be non-binding, does not imply that Congress meant to preclude binding arbitration, which is of a different nature. The legislative history's reference to "civil action" neither explicitly includes nor precludes binding arbitration. However, the reference to "informal dispute settlement procedure" seemingly precludes binding arbitration from its scope, as binding arbitration is not normally considered an informal procedure. Binding arbitration simply is not part of these reports. These passages therefore do not support an assertion that Congress intended to preclude binding arbitration.

Additionally, the Conference Committee Report states that the legislation requires "provision [by the warrantor] for governmental or consumer participation in internal or other private dispute settlement procedures . . . ." Id. Again, this does not indicate an intent to preclude binding arbitration. It simply requires that the consumer (or perhaps the government) participate in the

13

informal procedures established by the warrantor. The Committee cannot have had in mind binding arbitration in its comments, as the government does not normally participate in private binding arbitration procedures. Again, these congressional reports do not demonstrate that Congress intended for binding arbitration to be included within the scope of these informal dispute settlement procedures, nor that it intended to preclude binding arbitration under the MMWA.

In McMahon, the Court found that language in the legislative history of the Securities Exchange Act of 1934 -- language that appears more persuasive than that above -- did not evince a congressional intent to bar all pre-dispute agreements to arbitrate Securities Exchange Act claims. McMahon, 482 U.S. at 238. Specifically, the legislative history stated:

> The Senate bill amended section 28 of the Securities Exchange Act of 1934 with respect to arbitration proceedings between self-regulatory organizations and their participants, members, or persons dealing with members or participants. The House amendment contained no comparable provision. The House receded to the Senate. It was the clear understanding of the conferees that this amendment did not change existing law, as articulated in Wilko v. Swan, 346 U.S. 427 (1953), concerning the effect of arbitration proceedings provisions in agreements entered into by persons dealing with members and participants of self-regulatory organizations.

Id. at 236-37 (quoting H.R. Rep. No. 94-229, at 111 (1975), reprinted in 1975 U.S.C.C.A.N. 179, 342). This legislative history implied a congressional intent to adopt the then-valid holding in

Wilko that arbitration is an inadequate forum for the enforcement of Securities Act of 1933 statutory claims.[13]  The Court found that this reference was not clear enough to evidence congressional intent to preclude pre-dispute arbitration agreements as to Securities Exchange Act claims.  Id. at 237-38.

The legislative history here is not as persuasive as that in McMahon -- which was found unpersuasive by the Supreme Court -- and consequently we must conclude that the legislative history here does not evidence a congressional intent to preclude arbitration of MMWA claims.

C

Finally, we examine the purposes of the MMWA, and whether there is an inherent conflict between the MMWA and the FAA.  We know that the MMWA was enacted in order to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products."  15 U.S.C. § 2302(a).  The House Report on the MMWA states that "[t]he purpose of this legislation is (1) to make warranties on consumer products more readily understood and enforceable, (2) to provide the Federal Trade Commission (FTC) with means of better protecting consumers and (3) to authorize appropriations for the operations of the FTC for fiscal years 1975, 1976, and 1977."  We do not see any inherent

---

[13]The Supreme Court later overruled Wilko and upheld agreements to arbitrate Securities Act claims.  See Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 485 (1989).

conflict between arbitration and these purposes. Consumers can still vindicate their rights under warranties in an arbitral forum. Warranties can provide adequate and truthful information to consumers, while also requiring binding arbitration. Arbitration is not inherently unfair to consumers. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 280 (1995) ("Congress, when enacting the [FAA], had the needs of consumers . . . in mind.") Although the legislative history of the MMWA expresses a concern with the unequal bargaining power of consumers, see S. Rep. No. 93-151, at 22-23 (1973), a perception of unequal bargaining power is not enough to unilaterally hold arbitration agreements unenforceable. See Gilmer, 500 U.S. 33. Of course, courts can consider individual claims of fraud or unconscionability in arbitration agreements as they would in any other contract. See id. We thus can find no inherent conflict between the MMWA and the FAA.

We therefore hold that the text, legislative history, and purpose of the MMWA do not evince a congressional intent to bar arbitration of MMWA written warranty claims.[14] The clear congressional intent in favor of enforcing valid arbitration agreements controls in this case.[15] The Waltons signed a valid

---

[14]We therefore need not consider the second prong of the Chevron analysis.

[15]We note again, as we stated in Part II.B, that the MMWA requires consumers to submit to informal dispute settlement procedures for breach of written warranty claims, if the warrantor has established such procedures, before filing a civil action. See 15 U.S.C. § 2310(a)(3). Our holding in no way conflicts with

16

binding arbitration agreement, and they must arbitrate their MMWA claims.

IV

We recognize that some courts have found that the MMWA precludes binding arbitration, and that a number of courts have agreed with us.[16] We have found no other federal appellate opinions

this provision.

[16]Compare Parkerson v. Smith, 2002 WL 358678, *3 (Miss.) (en banc) (not yet released for permanent publication) (MMWA precludes arbitration, as it was enacted more recently than the FAA and is more specific; relying on Waverlee Homes, infra, the MMWA's provision of a judicial forum, and the FTC regulations under the MMWA); Browne v. Kline Tysons Imports, Inc., 190 F.Supp.2d 827 (E.D. Va. 2002) (claims under MMWA based on written warranties not subject to binding arbitration because Congress intended to allow consumers to adjudicate such claims in court); Yeomans v. Homes of Legend, Inc., 2001 WL 237313 (M.D. Ala.) (finding that Congress intended to preclude binding arbitration of express and written warranty claims under the MMWA; relying on the reasoning in Waverlee Homes, infra, which states in part that arbitration is precluded because the MMWA grants access to a judicial forum); Pitchford v. Oakwood Mobile Homes, Inc., 124 F.Supp.2d 958, 962-65 (W.D. Va. 2000) (relying largely on FTC's regulations finding binding arbitration to be impermissible and on the MMWA's grant of access to a judicial forum to find that the MMWA precludes binding arbitration of disputes over written warranties); Raesly v. Grand Housing, Inc., 105 F.Supp.2d 562, 573 (S.D. Miss. 2000) (finding that MMWA precludes binding arbitration of written warranty claims, relying on Waverlee Homes); Wilson v. Waverlee Homes, Inc., 954 F.Supp. 1530, 1532 (M.D. Ala. 1997) (MMWA precludes binding arbitration of MMWA claims, in part because it provides access to a judicial forum and because the FTC regulations have so interpreted it), with In re American Homestar of Lancaster, Inc., 50 S.W.3d 480, 490 (Tex. 2001) (MMWA's text, legislative history, and purpose do not preclude binding arbitration); Results Oriented, Inc. v. Crawford, 538 S.E.2d 73, 79-81 (Ga. Ct. App. 2000) (MMWA does not preclude arbitration of express and implied warranty claims, unless arbitration clause is unconscionable), aff'd as Crawford v. Results Oriented, Inc., 584 S.E.2d 432 (Ga. 2000); Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1135 (Ala. 2001) (holding arbitration provisions of a written warranty to be

17

on point, outside of the Eleventh Circuit.  Those cases that have found arbitration to be precluded have relied, at least in part, on the fact that the MMWA provides consumer access to a judicial forum.[17]  However, as discussed in Part III.A, this is not evidence of an intent to prohibit arbitration of a statutory claim.

Some of those cases also rely on the FTC regulations to determine congressional intent, and note that the regulations state that consumers should have full access to the courts and that informal dispute mechanisms should be non-binding.  For example, in Wilson v. Waverlee Homes, Inc., 954 F. Supp. 1530, 1537-39 (M.D. Ala. 1997), aff'd, 127 F.3d 40 (11th Cir. 1997) (table op.), the court held that the MMWA precludes binding arbitration of MMWA claims.  The court relied on: (1) the MMWA's provision of access to a judicial forum; (2) the fact that informal dispute settlement mechanisms are a prerequisite to suit; (3) the FTC regulations which reflect the MMWA's "command" that consumers should have access to the courts; and (4) the history of the FTC regulations which prohibit binding arbitration.  Id.; see also Yeomans v. Homes of Legend, Inc., 2001 WL 237313 (M.D. Ala.) (expressly adopting the reasoning and result in Wilson).[18]   But see Richardson v. Palm Harbor Homes, Inc., 254 F.3d 1321 (11th Cir. 2001) (predispute

binding).

[17]See note 16.

[18]See also cases in note 16.

18

arbitration agreement not rendered unenforceable by MMWA with respect to breach of oral express warranty claim under the Alabama Uniform Commercial Code). Again, the provision of access to a judicial forum is not evidence of intent to prevent the use of arbitration. Further, it is improper to use the FTC regulations themselves to determine congressional intent here. As noted previously, we must consider the statute's text, legislative history, and whether its purpose conflicts with another statute, to determine congressional intent. An agency's regulations, promulgated pursuant to a statute, are not part of this test. It is only after considering these three factors and determining that Congress's intent is ambiguous, that we would then proceed to consider the FTC's regulations and whether they are a permissible interpretation of the statute, per Chevron. We would not, in any case, use the regulations themselves to determine congressional intent.

V

We hold that the MMWA does not preclude binding arbitration of claims pursuant to a valid binding arbitration agreement, which the courts must enforce pursuant to the FAA. The Waltons are bound to arbitrate their claims. We REVERSE the judgment of the district court and REMAND for entry of judgment in accordance with this opinion.

REVERSED and REMANDED.

19

KING, Chief Judge, dissenting:

The case before us is, in essence, a classic Chevron case. The text of the MMWA contains a conspicuous and significant ambiguity: the Act can be read to prohibit the use of binding arbitration agreements in written warranties, or it can be read not to address the enforceability of binding arbitration clauses in written warranties, in which case the FAA's presumption of arbitrability would likely be applicable. The FTC – the agency to which Congress entrusted the task of implementing and elaborating the provisions of the MMWA – has interpreted the MMWA to preclude the enforcement of binding arbitration clauses in written warranties governed by the Act. We are bound to defer to the FTC's interpretation of the Act unless (1) Congress has "directly spoken to the precise question at issue" or (2) the FTC's construction of the statute is unreasonable. Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-43 (1984). While the majority apparently concedes that the text of the Act is ambiguous and that the legislative history is unilluminating, the majority nonetheless concludes that we must reject the FTC's interpretation under the first prong of Chevron because Congress has unambiguously stated that binding arbitration clauses in written warranties governed by the MMWA are enforceable. Because I find no such clear indicia of

21

congressional intent, and because I conclude that the

Commission's interpretation of the MMWA is reasonable and

entitled to judicial deference,[19] I respectfully dissent.

## I.  The FTC's Regulatory Construction of § 2310

The text of the MMWA contains no language explicitly

indicating whether Congress intended to preclude application of

the FAA to breach of written warranty claims brought under the

MMWA.[20]  While the statute makes clear that the "informal dispute

---

[19]   A number of federal district courts and state intermediate appellate courts have similarly deferred to the FTC's interpretation of the MMWA.  See, e.g., Pitchford v. Oakwood Mobile Homes, Inc., 124 F. Supp. 2d 958, 963 (W.D. Va. 2000); Wilson v. Waverlee Homes, Inc., 954 F. Supp. 1530, 1538-39 (M.D. Ala. 1997); Boroweic v. Gateway 2000, Inc., --- N.E.2d ---, 2002 WL 1159707, at *6 (Ill. App. 1 Dist. May 31, 2002); Philyaw v. Platinum Enters. Inc., No. CL00-236, 2001 WL 112107, at *2 (Va. Cir. Ct. Jan. 9, 2001).   In addition, the Mississippi Supreme Court recently held that binding pre-dispute arbitration agreements are not enforceable under the MMWA, based in part upon the court's determination that Chevron requires deference to the FTC regulations.  See Parkerson v. Smith, 817 So.2d 529, 533-34 (Miss. 2002) (four justices concurring, one justice concurring in the result only).

[20]   The absence of such explicit language is not particularly surprising.  At the time of the MMWA's passage, the FAA was not understood to be as broadly applicable as it is today.  The Act was widely thought to be inapplicable to claims based on assertions of statutory rights (as opposed to purely contractual claims).  See, e.g., Wilko v. Swan, 346 U.S. 427, 438 (1953), overruled by Rodriquez de Quijas v. Shearson/Am. Express Inc., 490 U.S. 477, 484-85 (1989).  In the early 1980s, however, the Supreme Court clarified (and, arguably, expanded) the scope of the FAA in a number of ways.  See Katherine Van Wezel Stone, Rustic Justice: Community and Coercion under the Federal Arbitration Act, 77 N.C. L. Rev. 931, 943-54 (1999) (detailing the history of the Court's increasingly expansive interpretation of the FAA's jurisdictional and substantive applicability).  Under this modern reading of the FAA, the presumption of enforceability "is not diminished when a party bound by an agreement raises a claim founded on statutory

22

settlement procedures" governed by § 2310 of the MMWA cannot be binding in nature, see 15 U.S.C. § 2310(a)(3)(c) (clarifying that a warrantor can require a consumer to resort to an informal dispute settlement procedure "before pursuing any legal remedy under this section") (emphasis added), the Act does not define the term "informal dispute settlement procedure" or clarify whether such proceedings are intended to be the exclusive alternative to litigation available under the Act.

The MMWA expressly authorizes the FTC to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty." See 15 U.S.C. § 2310(a)(2) (2000). Pursuant to this congressional delegation of rulemaking authority, the FTC has established detailed regulations governing the "mechanisms" that warrantors can require customers to utilize prior to "exercising rights or seeking remedies created by Title I of the Act." 16 C.F.R. § 703.2(b)(3) (2001).[21] The regulations define a "mechanism" as "an informal dispute settlement procedure which

_____

rights." Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 226 (1987).

[21] Any mechanism established in a warranty must be funded by the warrantor, 16 C.F.R. § 703.3(a) (2001), but must be sufficiently insulated from the warrantor "so that the decisions of the members and the performance of the staff are not influenced by either the warrantor or the sponsor," id. § 703.3(b). The regulations establish guidelines for investigation and collection of evidence, rendering of decisions, oral presentation by parties, and monitoring of settlement obligations. Id. § 703.5.

23

is incorporated into the terms of a written warranty to which any provision of Title I of the Act applies." Id. § 703.1(e). The FTC regulations clearly contemplate that mechanisms are a precursor, not an alternative, to litigation, stating:

> The Mechanism shall inform the consumer . . . that:
>
> (1) If he or she is dissatisfied with its decision or warrantor's intended actions, or eventual performance, legal remedies, including use of small claims court, may be pursued;
>
> (2) The Mechanism's decision is admissible in evidence as provided in section 110(a)(3) of the Act.

Id. § 703.5(g). Indeed, the regulations explicitly announce that "[d]ecisions of the Mechanism shall not be legally binding on any person." Id. § 703.5(j).[22]

The FTC interprets these regulatory provisions to preclude the inclusion of binding arbitration agreements in written warranties. The FTC apparently adopts the position that the term "mechanism" is appropriately read broadly, to encompass all non-

---

[22] However, a warrantor must "act in good faith in determining whether, and to what extent, it will abide by a Mechanism decision." 16 C.F.R. § 703.2(g) (2000).

24

judicial dispute resolution procedures, including arbitration. See, e.g., 40 Fed. Reg. 60167, 60210 (Dec. 31, 1975) (characterizing binding arbitration as a type of "mechanism[] whose decisions would be legally binding"). Under this reading, binding arbitration is precluded by the plain language of the regulations specifying that mechanisms cannot be legally binding on any party. Indeed, in responding to public comments suggesting that warrantors should be permitted to include binding arbitration agreements in written warranties, the FTC explicitly indicated that the rule precluded such arrangements. The Commission clarified that:

> The Rule does not allow this for two reasons. First, as the Staff Report indicates, Congressional intent was that decisions of Section 110 Mechanisms not be legally binding. Second, even if binding Mechanisms were contemplated by Section 110 of the Act, the Commission is not prepared, at this point in time, to develop guidelines for a system in which consumers would commit themselves, at the time of product purchase, to resolve any difficulties in a binding, but non-judicial, proceeding. The Commission is not now convinced that any guidelines which it

25

> set out could ensure sufficient protection
>
> for consumers.

Id.  While the FTC did clarify that a warrantor and a consumer could agree to submit their dispute to binding arbitration after the mechanism has rendered a decision (thus approving post-dispute binding arbitration agreements), the Commission adhered firmly to its position that inclusion of pre-dispute binding arbitration clauses in a written warranty is impermissible because "reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act."  Id. at 60211.[23]

As the majority correctly recognizes, we are required to defer to the FTC's construction of the MMWA unless: (1) Congress has directly spoken to the precise question at issue, or (2) the FTC's construction is unreasonable.  Chevron, 467 U.S. at 842-43. The majority reaches only the first of these inquiries, finding that Congress has unambiguously stated that binding arbitration

---

[23]  The FTC's interpretive regulations under the MMWA (promulgated two years after the legislative regulations) further clarify the Commission's position on the use of binding arbitration clauses in written warranties.  These regulations explain that "[a] warrantor shall not indicate in any written warranty or service contract either directly or indirectly that the decision of the warrantor, service contractor, or any designated third party is final or binding in any dispute concerning the warranty or service contract. . . . Such statements are deceptive since . . . the Act gives state and federal courts jurisdiction over suits for breach of warranty and service contract."  16 C.F.R. § 700.8 (2001) (emphasis added).

26

clauses are enforceable in written warranties governed by the MMWA. Because I cannot agree with this conclusion, I address both prongs of the Chevron inquiry in turn.

## II. Has Congress Directly Spoken to the Precise Question at Issue?

Despite its acknowledgment that neither the text nor the legislative history of the MMWA clearly indicates whether the "informal dispute settlement procedures" provided for in § 2310 are intended to be the exclusive alternative to litigation available for breach of written warranty claims under the Act, the majority nonetheless finds that Congress has "directly spoken to the precise question at issue." Initially, the majority points to the fact that, fifty years prior to the passage of the MMWA, Congress expressed a general policy favoring arbitration of contractual claims in a different statute. The majority apparently finds that this general policy expressed in the FAA is indicative of Congress's intent in enacting the MMWA.

The Supreme Court has indicated that a reviewing court considering whether Congress has specifically addressed a question under the first prong of Chevron "should not confine itself to examining a particular statutory provision in isolation" but should instead read the words of the statute "in

their context and with a view to their place in the overall statutory scheme." F.D.A. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)). For example, in Brown v. Gardner, 513 U.S. 115 (1994), the Court considered a Department of Veterans' Affairs regulation that interpreted the term "injury" in a veterans' benefits statute to include only intentionally inflicted injuries. The Court concluded that Congress had directly spoken to the question at issue, based in part upon the Court's finding that the word "injury" was used in other portions of the same veterans' benefits statute and in analogous statutes dealing with service-related injuries in ways clearly indicating a reference to both intentional and unintentional injuries. See id. at 118.

Similarly, the Supreme Court has also acknowledged that a court considering whether Congress has specifically addressed a particular question under the first prong of Chevron may glean Congress's "clear intent" regarding an earlier statute from subsequent statutes addressing the same subject matter. As the Brown & Williamson Court recognized:

> At the time a statute is enacted, it may have
> a range of plausible meanings. Over time,
> however, subsequent acts can shape or focus
> those meanings. The classic judicial task of
> reconciling many laws enacted over time, and

28

getting them to "make sense" in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.  This is particularly so where the scope of the earlier statute is broad but subsequent statutes more specifically address the topic at hand.  As we recognized recently . . . a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended.

529 U.S. at 143 (internal citations and quotations omitted, alterations in original).  Based in part on this reasoning, the Brown & Williamson Court concluded that the Food, Drug, and Cosmetic Act did not permit the Food and Drug Administration to regulate tobacco products, because Congress had expressed its intent regarding the appropriate regulation of such products in the six tobacco-specific pieces of legislation it enacted subsequent to the Food, Drug, and Cosmetic Act.  See id. at 143-57.

In the instant case, the majority has not gleaned clear congressional intent from the use of similar words in related statutes, as did the Court in Gardner.  Nor has the majority found such clear intent by examining Congress's refinement of a

29

general statute in a subsequent, more specific statute, as did the Brown & Williamson Court.  Instead, the majority bases its conclusion that Congress has "directly spoken to the precise question" of how to interpret § 2310 of the MMWA on a general policy expressed in a prior, less specific statute.  The Supreme Court has never invoked similar reasoning in applying the first prong of the Chevron inquiry.  However, even assuming, arguendo, that this method of statutory construction would be appropriate in some circumstances, it is clearly problematic in the context of the instant case.

As the Supreme Court has consistently recognized, the presumption of arbitrability established by the FAA is not absolute and "may be overridden by a contrary congressional command" in the statute creating the right at issue. Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 226 (1987); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991).  The question in the instant case is whether the informal dispute settlement mechanism provisions in § 2310 of the MMWA express such a contrary congressional command.  The majority, however, concludes that Congress did not intend to express such a command in the MMWA, based on indicia of congressional intent expressed in the FAA.  Such circular logic is unpersuasive: the presumption of arbitrability becomes relevant after it is established that there is no contrary congressional command.  It

is inappropriate to apply the presumption in ascertaining whether the statute in question contains such a command.

The majority further argues that Congress could not possibly have intended for § 2310's provisions regarding "informal dispute settlement procedures" to govern arbitration proceedings because "binding arbitration is not normally thought of as an informal procedure."  Unlike the majority, I am extremely hesitant to conclude that Congress has directly addressed an apparent statutory ambiguity based on a judicial assumption about what a term "normally" means.  In addition, even assuming the majority's understanding of the generally accepted meaning of "informal procedures" was persuasive indicia of Congress's intent in enacting the MMWA, it is not at all clear that the majority's conclusion that arbitration "is not normally thought of as an informal procedure" accurately reflects how "arbitration" was perceived at the time of the MMWA's enactment in 1974.  As numerous commentators have recognized, the formality of arbitration proceedings has increased notably in the latter half of the twentieth century, particularly in the period since the Supreme Court "revitalized" the FAA by clarifying its applicability to statutory claims in the late 1980s.  See, e.g., Edward Brunet, Replacing Folklore Arbitration with a Contract Model of Arbitration, 74 Tul. L. Rev. 39, 42-47 (1990) (describing the shift from the "folklore arbitrations" that were common in the early part of the twentieth century, wherein

31

"informal procedures dominated," there was "little or no discovery" and "[e]vidence rules were inapplicable" to modern arbitrations which "resemble litigation" in the sense that there can be "routine discovery, motion practice, application of substantive legal rules, [and] written discursive awards with findings of fact and conclusions of law"); G. Richard Shell, ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" for the Courts?, 68 Tex. L. Rev. 509, 534 (1990) ("Historically, commercial and labor arbitration have shared a basically informal approach to the actual fact-finding and adjudication process. . . . In response to recent Supreme Court decisions encouraging the use of commercial arbitration, however, and as part of a general effort to ensure that arbitration procedures adequately protect substantive rights, commercial arbitration institutions have begun to reform their procedures and have added considerable formality to their proceedings."); cf. Bernhardt v. Polygraphic Co., 350 U.S. 198, 203 (1956) (describing commercial arbitration proceedings in 1956 and concluding that "[a]rbitrators do not have the benefit of judicial instruction on the law; they need not give their reasons for their results; the record of their proceedings is not as complete as it is in a court trial; and judicial review of an award is more limited than judicial review of a trial"). Moreover, even today, arbitration undoubtedly constitutes a more "informal" procedure than litigation. Thus,

to categorize arbitration as "formal" or "informal" largely begs the question of the appropriate basis of comparison.  Under these circumstances, even if the majority is correct that most people would characterize arbitration as a "formal" procedure at this point in time, this perception hardly provides conclusive evidence that the 1974 Congress did not intend to address arbitration proceedings in enacting MMWA provisions governing "informal dispute resolution proceedings."

Neither the text of § 2310 nor the statutory context of this provision conclusively indicates whether § 2310 applies to arbitration proceedings (i.e., whether § 2310-governed "informal dispute settlement procedures" are intended to be the <u>exclusive</u> alternative to litigation under the Act).  While the legislative history contains some indication that Congress did intend for § 2310 procedures to be the exclusive non-judicial forum available under the Act,[24] these indicia are not sufficiently illuminating that the legislative history can be deemed conclusive regarding congressional intent.  Moreover, there are no subsequent congressional enactments addressing written warranties that clarify this issue.  Under these circumstances, there is no basis for this court to conclude that Congress has "directly spoken to the precise question at issue."

---

[24]    <u>See</u> <u>infra</u> Part III.

33

Because I conclude that Congress has not directly spoken to the question we face today, I find it is necessary to reach the second prong of the <u>Chevron</u> inquiry – namely, whether the Commission's interpretation of § 2310 is based on a permissible construction of the statute.

## III. Is the FTC's Interpretation of the MMWA Unreasonable?

Because Congress has "delegated authority to the agency generally to make rules carrying the force of law," <u>United States v. Mead Corp.</u>, 121 S. Ct. 2164, 2171 (2001), we are required to defer to the Commission's construction of the statute unless that interpretation is unreasonable. <u>Chevron</u>, 467 U.S. at 843.[25]

---

[25] It merits notice that this standard of deference appears to be applicable to the Commission's legislative regulations, but not necessarily to its interpretive regulations. The legislative regulations, 16 C.F.R. §§ 701-03 (2001), were promulgated pursuant to Congress's express grant of rulemaking authority to the FTC in the MMWA, 15 U.S.C. §§ 2309-10 (1994). As the Supreme Court recently recognized, "express congressional authorizations to engage in the process of rulemaking" are "a very good indicator of delegation meriting <u>Chevron</u> treatment." <u>Mead Corp.</u>, 121 S.Ct. at 2172. Accordingly, to the extent that the statute is "silent or ambiguous" with respect to an issue, we must defer the Commission's interpretation in its legislative regulations if that interpretation is reasonable. <u>See</u> <u>Whitman v. Am. Trucking Assocs., Inc.</u>, 531 U.S. 457, 481 (2001).

In contrast, the FTC's interpretive rules are not necessarily subject to <u>Chevron</u> deference. <u>See, e.g.</u>, <u>Martin v. Occupational Safety & Health Review Comm'n</u>, 499 U.S. 144, 157 (1991) (noting that interpretive rules and enforcement guidelines are "not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers"). While the FTC's rules, unlike many interpretive rules, were subject to notice and comment (i.e., the FTC published a notice of the proposed rules in the Federal Register and interested parties were permitted to submit written comments), these interpretations were not subject to the level of public participation mandated by the MMWA's provisions governing the promulgation of regulations. <u>See</u>

Southern Energy argues that the FTC's interpretation is unreasonable because the regulations indicate that the Commission's rationale for concluding that the MMWA prohibits binding arbitration provisions in written warranties was its determination that such provisions are "deceptive since . . . the Act gives state and federal courts jurisdiction over suits for breach of warranty and service contract."  16 C.F.R. § 700.8 (2001).  Pointing to the Supreme Court's holding that a mere statutory grant of jurisdiction to federal or state courts does not preclude enforcement of a mandatory arbitration provision under the FAA, see, e.g., Gilmer, 500 U.S. at 29; McMahon, 482 U.S. at 227, Southern Energy argues that deference to the FTC regulations is inappropriate because the Commission's interpretation of the MMWA is not based on a permissible

_____

15 U.S.C. § 2309 (1994) (noting that to properly prescribe a rule under the MMWA, the Commission must "give interested persons an opportunity for oral presentations of data, views, and arguments, in addition to written submissions").  Moreover, in light of the agency's disclaimer that its interpretive regulations are not intended to have the force of law, see 42 Fed. Reg. 36111, 36112 (July 13, 1977) (noting that the interpretive regulations "are not . . . substantive rules and do not have the force or effect of statutory provisions" and that "like industry guides, they are advisory in nature"), it appears that these regulations are not entitled to Chevron deference.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant Chevron-style deference.").  Such interpretive regulations are "entitled to respect," but only to the extent that they "have the power to persuade."  Id. at 587 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (internal quotations omitted)).

35

construction of the statute. Two state supreme courts have found this reasoning persuasive in determining that the FTC's regulations do not preclude the enforceability of binding arbitration agreements in written warranties. See In re Am. Homestar of Lancaster, Inc., 50 S.W.3d 480, 491 (Tex. 2001) (noting that while it would normally be appropriate to accord Chevron deference to the FTC's interpretation of the statute it administers, no such deference is owed to the regulation precluding binding arbitration agreements under the MMWA because "the Supreme Court . . . has rejected arguments similar to those upon which the FTC relies to conclude the statute prohibits binding arbitration"); Southern Energy Homes, Inc. v. Ard, 772 So. 2d 1131, 1135 (Ala. 2000) (explicitly adopting Justice See's dissent in Southern Energy Homes, Inc. v. Lee, 732 So. 2d 994, 1010 (Ala. 1999), which reasoned that "[a]lthough reasonable deference is due an interpretation of a statute by an agency charged with administering that statute, no such deference is due when the Supreme Court has expressly rejected the rationale on which the agency interpretation is based").

While the FTC's interpretive regulations do suggest that the Commission's construction of the statute was partially based on its reading of the statute's jurisdictional provision, the materials accompanying the FTC's promulgation of its legislative

36

regulations (the appropriate focus of our Chevron inquiry)[26] signal that the Commission had a number of permissible reasons for reading the statute as it did. According to the Federal Register commentary accompanying the FTC's promulgation of its legislative regulations, the Commission based its determination that Congress intended to preclude enforcement of binding arbitration clauses in written warranties on two factors: (1) the Commission's reading of a staff report of the House Interstate and Foreign Commerce Committee's Subcommittee on Commerce and Finance; and (2) the Commission's concern that such arbitration provisions would inadequately protect the interests of consumers. See 40 Fed. Reg. 60167, 60210 (Dec. 31, 1975). Initially, the Commission apparently read portions of the legislative history of the MMWA (specifically, the subcommittee staff report) to signal Congress's intent that dispute resolution mechanisms established pursuant to the Act would not be legally binding. While it is not possible to confirm the validity of this reading of the subcommittee staff report,[27] such resources are certainly a permissible basis for an agency's conclusions regarding congressional intent, as the reasonableness of an agency's construction of a statute is often assessed in light of the legislative history. See, e.g., Chevron, 467 U.S. at 862-64;

---

[26]    See supra note 7.

[27]    This report appears to be no longer obtainable.

Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704-08 (1995).

The Commission's second expressed motive for precluding binding arbitration agreements in written warranties is its concern that such binding arbitration agreements inadequately protect consumers. As a general rule, this court is obliged to defer to the FTC's expertise regarding the most appropriate way to effect the MMWA's consumer protection goals. As the Supreme Court noted in Chevron, "the principle of deference to administrative interpretations has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." 467 U.S. at 844. However, such deference might be inappropriate if the FTC's concerns about the impact of binding arbitration on consumers were attributable to the Commission's reliance on the Supreme Court's expressed hostility towards arbitration in now-abandoned cases such as Wilko.[28] See, e.g., McMahon, 482 U.S. at 234 n.3 (declining to defer to the SEC's interpretation of the Securities Exchange Act of 1934 based on the SEC's admission that "its actions were not based on any independent analysis of [the

---

[28]    See supra note 2.

statute], but instead were premised on the Commission's assumption, based on court of appeals decisions following <u>Wilko</u>, . . . that agreements to arbitrate Rule 10b-5 claims were not, in fact, enforceable") (internal citations and quotations omitted, alterations in original). Unlike the SEC in <u>McMahon</u>, however, the FTC in the instant case has published a recent regulatory review statement[29] in the Federal Register confirming that its original reading of the MMWA to preclude binding arbitration <u>was</u> based on independent analysis of the statute. <u>See</u> 64 Fed. Reg. 19700, 19708 (Apr. 22, 1999) ("The Commission examined the legality and the merits of mandatory binding arbitration clauses in written consumer products warranties when it promulgated Rule 703 in 1975. Although several industry representatives at that time had recommended that the Rule allow warrantors to require consumers to submit to binding arbitration, the Commission rejected that view as being contrary to the congressional intent. <u>The Commission based this decision on its analysis of the plain language of the Warranty Act.</u>") (emphasis added).

---

[29] The FTC requested comments on its rules and guides interpreting and implementing the MMWA "as part of its regulatory review program, under which it reviews rules and guides periodically in order to obtain information about the costs and benefits of the rules and guides under review, as well as their regulatory and economic impact." 64 Fed. Reg. 19700, 19700 (Apr. 22, 1999). "After careful review of the comments received in response" to its request, the Commission decided to retain the interpretations and rules without change. <u>Id.</u>

This regulatory review statement by the FTC confirms that, even in light of the Court's post-Wilko endorsement of arbitration, the FTC continues to read the MMWA's provisions to preclude binding arbitration agreements in written warranties. See id. ("[T]he Commission determined that reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act. The Commission believes that this interpretation continues to be correct . . . Rule 703 will continue to prohibit warrantors from including binding arbitration clauses in their contracts with consumers that would require consumers to submit warranty disputes to binding arbitration.") (internal citations and quotations omitted). Accordingly, unlike the regulation at issue in McMahon, the agency's statutory interpretation in the instant case cannot be deemed "unreasonable" based on the agency's presumed reliance on abandoned legal principles.[30] Contrary to Southern Energy's

---

[30] It merits notice that the FTC's justification for its prohibition on binding arbitration in the 1999 regulatory review proceeding is consistent with the rationale that the FTC advanced at the time of its original promulgation of the legislative regulations. Accordingly, we are not precluded from giving appropriate consideration to the Commission's post-promulgation explanation by the Court's precedents disapproving deference to "post-hoc" agency justifications for regulatory interpretations. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-21 (1971) (holding that post-hoc rationalizations cannot justify an agency decision that was based on an otherwise invalid rationale); see also America's Cmty. Bankers v. Federal Deposit Ins. Corp., 200 F.3d 822, 835 (D.C. Cir. 2000) (applying the holding of Overton Park to the review of statutory interpretations under the second prong of Chevron).

assertion, neither of the FTC's expressed rationales for its interpretation of the MMWA indicates that the Commission's reading is based on an impermissible construction of the statute.

While the majority purports not to reach the second prong of Chevron, see majority opinion at note 14, the majority espouses an additional argument against the Commission's construction of § 2310 that appears to be more directly relevant to the inquiry under the second Chevron prong (i.e., whether the Commission's interpretation of the MMWA is reasonable) than under the first Chevron prong. Specifically, the majority contends that the agency's construction of § 2310 is unreasonable because it is inconsistent with the Supreme Court's opinion in Gilmer. In Gilmer, the Court considered whether an employee's claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. (1994), should be submitted to compulsory arbitration pursuant to an arbitration agreement in the employee's securities registration application. The employee argued that Congress intended to preclude application of the FAA to claims under the ADEA, suggesting that under the third prong of the McMahon test, there is an "inherent conflict" between arbitration and the ADEA's underlying purpose. Gilmer, 500 U.S. at 26-27. The employee relied in part upon an ADEA provision requiring the EEOC to "promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion" upon receipt of a charge of discrimination. 29 U.S.C. § 626(d)

(1994). The employee apparently argued, inter alia, that this provision signaled Congress's intent to have the EEOC involved in any judicial or non-judicial resolution of statutory claims, thus precluding enforcement of a binding arbitration provision that would resolve disputes without EEOC involvement because this alternative would "undermine the role of the EEOC." Gilmer, 500 U.S. at 28. The Court rejected this argument, concluding that "nothing in the ADEA indicates that Congress intended that the EEOC be involved in all employment disputes" and that "the mere involvement of an administrative agency in the enforcement of a statute is not sufficient to preclude arbitration." Id. at 28-29.

The majority reads Gilmer to hold, as a broad proposition, that express provision in a statute for out-of-court dispute resolution does not preclude application of the FAA. See also, e.g., Cunningham v. Fleetwood Homes of Georgia, Inc., 253 F.3d 611, 619-20 (11th Cir. 2001); Am. Homestar, 50 S.W.3d at 487; Ard, 772 So.2d at 1135 (explicitly adopting Justice See's dissent in Lee, 732 So.2d at 1012). However, I find the Gilmer Court's discussion of the EEOC's participation in "informal methods of conciliation, conference, and persuasion" to be too far afield from the facts of the instant case to be dispositive.

Initially, it merits notice that the position advanced by the Waltons in the instant case is materially different from the position advanced by the employee in Gilmer. The Waltons ask

42

this court to defer to an administrative agency's regulatory interpretation that Congress intended for a statute to preclude binding arbitration, not to read a prohibition of binding arbitration into a statute and its regulations based on concerns about impermissibly diminishing the role of the agency. Moreover, the language of the statutory provision at issue in Gilmer is materially different from the language in the MMWA at issue in this case. The ADEA's admonishment that the EEOC should attempt to engage in "conciliation, conference, and persuasion" with the employer upon receipt of an employment discrimination charge cannot be read to speak to the availability of binding arbitration in the same way as a statutory provision that, by its terms, addresses "any informal dispute settlement procedure" provided for in a written warranty. Indeed, it is clear that Congress did not attribute the same meaning to the two phrases. Unlike the MMWA, the ADEA contains no statutory language instructing the regulatory agency to promulgate procedures and regulations governing "conciliation, conference, and persuasion" under the ADEA. Moreover, the EEOC regulations contain no detailed alternative dispute resolution procedures akin to those contained in the FTC's MMWA regulations, suggesting that the EEOC did not read the "conciliation, conference and persuasion" language in the ADEA to constitute a congressional delegation of authority to regulate alternative dispute resolution mechanisms under the Act. Under these circumstances, the FTC's construction

43

of the MMWA cannot be deemed "unreasonable" based on a perceived inconsistency with the Court's reasoning in <u>Gilmer</u>.  <u>Gilmer</u> is simply inapposite.

As none of the arguments advanced by Southern Energy or the majority convincingly demonstrates that the FTC's construction of § 2310 is unreasonable, this court is required to defer to the FTC's interpretation of the statute.  Moreover, there are a number of compelling independent reasons why the FTC regulations at issue in the instant case are entitled to particular deference from this court.

Initially, it merits notice that the FTC's legislative regulations constitute a <u>contemporaneous</u> regulatory interpretation of the MMWA.  An administrative interpretation "has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."  <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 450 (1978) (alteration in original) (quoting <u>Norwegian Nitrogen Prods. Co. v. United States</u>, 288 U.S. 294, 315 (1933)); <u>cf.</u> Stephen Breyer, <u>Judicial Review of Questions of Law and Policy</u>, 38 Admin. L. Rev. 363, 368 (1986) (noting that one rationale for deference to an agency's contemporaneous interpretation of a statute is the notion that "[t]he agency that enforces the statute may have had a hand in drafting its provisions" and that

44

the agency "may possess an internal history in the form of documents or 'handed-down oral tradition' that casts light on the meaning of a difficult phrase or provision").  But cf. Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 740-41 (1996) (reasoning that "contemporaneity" is not a condition of validity under the second prong of Chevron, as Chevron deference is grounded in notions of congressional delegation of interpretive authority to agencies rather than "a presumption that [the agency] drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors").

   Similarly, this court should accord particular deference to the FTC's regulatory interpretation of the MMWA because the regulations represent a longstanding, consistent interpretation of the statute.  While agency interpretations that are revised over time are certainly entitled to Chevron deference, see Rust v. Sullivan, 500 U.S. 173, 186 (1991), longstanding and consistent agency interpretations carry special weight.  See NLRB v. Bell Aerospace Co. Div. Textron Inc., 416 U.S. 267, 274-75 (1974) ("[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration."); see also Smiley, 517 U.S. at 740 (noting that, while antiquity is not a condition of validity under the second prong of Chevron, "agency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist").

45

Such a "credential of reasonableness" appears to be particularly warranted in the instant case, where the agency has recently reconsidered and reaffirmed its longstanding, consistent interpretation of the statute through a notice-and-comment regulatory review proceeding.

Finally, while the legislative history of the MMWA does not contain any specific discussion of the availability of arbitration,[31] there is some indirect indication in the legislative history that Congress intended for internal dispute settlement mechanisms governed by § 2310 to be the exclusive alternative to litigation available under the Act, thus confirming the validity of the reading espoused by the FTC and the Waltons. Language in the report of the Senate Committee on Commerce is particularly enlightening.[32] The general description of the legislation contained in that report describes the bill's remedial provisions as follows:

---

[31]     In light of the statutory history of the FAA outlined supra at note 2, the absence of such discussion is unsurprising – it is unclear whether and to what extent Congress would have contemplated that the FAA might be applicable to statutory remedies at the time of the MMWA's enactment.

[32]     While the House version of the MMWA legislation was the basis for the conference committee's deliberations and the eventual legislation that was enacted, see S. Conf. Rep. No. 93-1408 (1974), reprinted in 1974 U.S.C.C.A.N. 7755, 7758, the House and Senate versions of the legislation contained only minor differences with respect to the remedial provisions of the MMWA. See generally id. None of these minor differences undermine the value of the Senate report in illustrating Congress's intentions regarding the MMWA.

> If a supplier fails to honor his warranty or service contract promises, the consumer can avail himself of <u>certain specified remedies</u>. If that supplier has provided a bona fide informal dispute settlement mechanism by which disputes between suppliers and consumers are to be resolved, then the consumer would utilize the informal dispute settlement mechanism before pursuing other avenues of redress. <u>If a supplier does not have an informal dispute settlement mechanism for resolving consumer complaints</u>, or if the consumer is not satisfied with the results obtained in any informal dispute settlement proceeding, <u>the consumer can pursue his legal remedies in a court of competent jurisdiction</u>, provided that he has afforded the supplier a reasonable opportunity to cure the breach.

S. Rep. No. 93-151, at 2-3 (1973) (emphasis added). This passage suggests that Congress intended for the MMWA to authorize only the specific remedial mechanisms mentioned in the Act. This language also implies that litigation, not arbitration, is the "other avenue[] of redress" available to the consumer if the warrantor has not established an informal dispute settlement mechanism or if the consumer is unsatisfied with the results of that proceeding.

The same conclusion is suggested in the report's subsequent, more detailed analysis of the MMWA's remedial provisions. This portion of the report states: "[Section 2310] spells out the remedies available to the purchaser of consumer products. A purchaser can utilize informal dispute settlement procedures established by suppliers or, having afforded a supplier a

47

reasonable opportunity to cure, may resort to formal adversary proceedings with reasonable attorney's fees available if successful in the litigation."   Id. at 22-23.  This passage suggests that litigation (not arbitration) is the "formal adversary proceeding" contemplated by the Act for a consumer who is dissatisfied with the warrantor's attempt to cure or with any informal dispute settlement procedure that the warrantor has established.

Language in the Conference Committee report provides further confirmation that Congress intended § 2310-compliant procedures to be the exclusive method of non-judicial dispute resolution available under the Act.  The Conference Committee report states:

> It should be recognized . . . that provision for governmental or consumer participation in internal or other private dispute settlement procedures under the bill is required by this legislation.  Consequently warranties providing that consumers must first resort to informal dispute settlement procedures before initiating a suit are contrary to the intent of the legislation where there is no provision for governmental or specific consumer participation in the procedure or where the procedure is otherwise unfair.

S. Conf. Rep. No. 93-1408 (1974), reprinted in 1974 U.S.C.C.A.N. 7755, 7758 (emphasis added).  This passage is enlightening for two reasons.  First, it equates the term "informal dispute settlement procedure" as used in the Act with a more general definition (i.e., "internal or other private dispute settlement procedure"), thus suggesting that Congress intended for the term

48

"informal dispute settlement procedure" to be read broadly. In addition, by specifically indicating that any procedure that does not comply with the statutory requirement for consumer or governmental participation is "contrary to the intent of the legislation," this passage suggests that § 2310 was intended to govern all forms of alternative dispute resolution provided for in a written warranty.

These passages from the Conference Committee report and the Senate report reinforce the Commission's interpretation that Congress intended for § 2310 (and, thus, the FTC's implementing regulations) to govern all non-judicial forms of dispute resolution included in the terms of written warranties. Thus, while the legislative history of the MMWA may not be sufficient by itself to establish Congress's intent to preclude application of the FAA to claims for breach of written warranty under the MMWA, these materials provide added support for the "reasonableness" of the Commission's interpretation.

Accordingly, because I find that Congress has not "directly spoken to the precise question" whether binding arbitration clauses in written warranties governed by the MMWA are enforceable, and because the FTC's construction of the statute is eminently reasonable, I would defer to the Commission's expertise and affirm the district court's judgment refusing to compel arbitration of the Waltons' written warranty claims. I dissent.