# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

BRIAN LOVETT, PHIL BARTEL, )
And MEDLODEE BARTEL, )
individually and on behalf of all others )
similarly situated, )
      )
            Plaintiffs, )
      )
         v. ) C.A. No. N24C-09-266 SKR
      ) (CCLD)
BENETEAU GROUP AMERICA, )
INC. and BENETEAU, S.A., )
d.b.a. GROUPE BENETEAU; )
      )
            Defendants. )

Submitted: February 21, 2025
Decided: May 30, 2025

*Upon Defendant Beneteau Group America, Inc.'s Motion to Dismiss or, in the Alternative, to Compel Arbitration*

**GRANTED in part, DENIED in part.**

*Upon Defendant Beneteau, S.A.'s Motion to Dismiss or, in the Alternative, to Compel Arbitration*

**GRANTED.**

## MEMORANDUM OPINION AND ORDER

Dashiell R. Radosti, Esq., EQUAL JUSTICE SOLUTIONS, Wilmington, Delaware. Edwin J. Kilpela, Jr., Esq., James M. LaMarca, Esq., Raymond Collins Kilgore, Esq., WADE KILPELA SLADE LLP, Pittsburgh, Pennsylvania. *Attorneys for Plaintiffs Brian Lovett, Phil Bartel, and Melodee Bartel.*

David Osipovich, Esq., K&L GATES LLP, Pittsburgh, Pennsylvania. Jeffrey D. Smith, Esq., HONIGMAN LLP, Kalamazoo, Michigan. Raechel T.X.

Conyers, Esq., HONIGMAN LLP, Detroit, Michigan.  Anna C. Transit, Esq., HONIGMAN LLP, Chicago, Illinois. Matthew B. Goeller, Esq., Michael J. Vail, Esq.,  K&L GATES LLP, Wilmington, Delaware.  *Attorneys for Defendants Beneteau Group America, Inc. and Beneteau, S.A.*

**RENNIE, J.**

# I. INTRODUCTION

This is a putative class action against a French boat manufacturer and its Delaware subsidiary for violations of the Magnuson Moss Warranty Act (the "MMWA" or the "Act")—a federal consumer protection statute. The MMWA contains a provision that restricts a company from tying the validity of a consumer product's warranty to the repairing or servicing of the product by specific providers. Plaintiffs allege that Defendants provided warranties that contain such tying requirements when they sold their boats. Plaintiffs further allege that Defendants did not sufficiently disclose the hurdles and hidden costs consumers would encounter in order to comply with the conditions necessary to preserve their warranties.

Each Defendant moves separately to dismiss on various grounds. For the reasons set forth below, Defendant Beneteau S.A.'s motion to dismiss is **GRANTED** in full. Defendant Beneteau Group America, Inc.'s motion to dismiss is **GRANTED** as to the claims asserted by Plaintiff Brian Lovett, and **DENIED** as to the claims asserted by Plaintiffs Phil and Melodee Bartel.

1

## II. BACKGROUND[1]

### A. THE PARTIES

Plaintiff Brian Lovett ("Lovett") is a citizen of Florida.[2] Plaintiffs Phil Bartel and Melodee Bartel (the "Bartels") are citizens of Canada.[3]

Defendant Beneteau, S.A. d/b/a Groupe Beneteau ("Beneteau") is a multinational corporation headquartered in France.[4] Defendant Beneteau Group America, Inc. ("BGA") is a Delaware corporation headquartered in Fort Lauderdale, Florida.[5] BGA is the United States subsidiary of Beneteau.[6]

### B. DEFENDANTS' COMMERCIAL ACTIVITIES IN THE U.S.

Beneteau manufactures and sells recreational boats around the world.[7] Beneteau conducts business in the United States through BGA, its wholly owned Delaware subsidiary.[8] Beneteau manufactures all the boats under its brand, and BGA distributes those boats to retail dealers.[9] The retailers then sell and service them throughout the United States.[10] Beneteau exercises direct control over BGA

---

[1] The following facts are derived from the Complaint and the documents incorporated therein. These allegations are presumed to be true solely for purposes of this motion.

[2] Class Action Compl. (D.I. No. 1) [hereinafter "Compl."] ¶ 7.

[3] Compl. ¶ 8. Unlike in the body text, the caption of the Complaint spells Melodee Bartel's first name as "MEDLODEE."

[4] *Id.* ¶ 9.

[5] *Id.* ¶ 10.

[6] *Id.*

[7] *Id.* ¶¶ 2, 66.

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 25.

[10] *Id.* ¶ 25.

2

in major aspects of BGA's business.[11]  Beneteau not only shares many high-level personnel with BGA, but also directs BGA's marketing, branding, finance, and compliance.[12]  Moreover, Beneteau fully controls the warranty service process for boats in the United States, including determining which parts to use and how many hours to allocate to warranty services.[13]  Beneteau also monitors and controls BGA's expenses in connection with providing warranty services.[14]

Although consumers purchase Beneteau-manufactured boats from retail dealers, it is BGA and/or Beneteau that provide the warranty for each boat sold.[15] In many instances, American consumers seeking warranty services allegedly must pay for the services out-of-pocket and submit the claim to Beneteau or BGA for payment.[16]  BGA then reimburses the consumer for those services.[17] Plaintiffs Lovett and the Bartels are among the consumers in the United States whose warranty services Defendants administer.[18]

---

[11] Compl. ¶¶ 42–59.
[12] *Id.*
[13] *Id.* ¶ 55.
[14] *Id.* ¶ 56.
[15] *Id.* ¶ 64.
[16] *Id.*
[17] *Id.*
[18] *See id.* ¶¶ 7–8, 118–124, 130–134.

**C. LOVETT'S BOAT PURCHASE, WARRANTY, AND EFFORT TO OBTAIN SERVICE**

On May 1, 2021, Lovett purchased a 2020 Lagoon 52F sailing catamaran boat that was allegedly manufactured by Beneteau and distributed by BGA.[19] Lovett purchased the boat in South Africa[20] and was assured by a representative of Beneteau that the warranty would apply in the United States.[21] At the time of the purchase, Lovett received a warranty for his boat titled "GENERAL WARRANTY CONDITIONS FOR YOUR LAGOON."[22] That warranty provides, in relevant part: "The benefit of the warranty is contingent upon the completion, by an official Lagoon distributor or authorised service centre, of a full and compulsory annual overhaul at the expense of the purchaser-user."[23]

Following the purchase, Lovett sailed the boat to the Mid-Atlantic seaboard and registered it in the state of Delaware.[24] The boat experienced major issues thereafter.[25] Lovett first contacted representatives of Defendants to obtain repair services in July of 2021, but Defendants did not service Lovett's boat until January

---

[19] Compl. ¶ 7. In its opening brief, Beneteau disputes this allegation and states that Lovett's boat was manufactured by non-party Construction Navale Bordeaux, S.A. *See* Opening Br. Supp. Beneteau, S.A.'s Mot. Dismiss or, in the Alternative, to Compel Arbitration (D.I. No. 28) [hereinafter "Beneteau's Mot."] at 4.

[20] Pls.' Omnibus Br. Opp'n Defs.' Mots. Dismiss (D.I. No. 53) [hereinafter "Pls.' Opp'n"] at 26 (admitting that Lovett purchased his boat in South Africa).

[21] Compl. ¶ 113.

[22] Compl. Ex. A (Lovett's Boat Warranty).

[23] *Id.*

[24] Compl. ¶¶ 115–16.

[25] *Id.* ¶ 117.

4

of 2022.[26]  The five-month-long delay allegedly caused Lovett to incur docking fees and suffer loss of enjoyment of his boat.[27]  Lovett also paid thousands of dollars in storage fees while his boat was being repaired under warranty—a hidden expense that was not disclosed at the time of purchase.[28]

### D. THE BARTELS' BOAT PURCHASE, WARRANTY, AND EFFORT TO OBTAIN SERVICE

The Bartels had a similar experience when seeking repair services under their warranty.  On or about November 29, 2021, the Bartels purchased their 2020 Beneteau Oceanis 46.1 sailboat.[29]  The Bartels' boat was manufactured by Beneteau and distributed by BGA.[30]  At the time of purchase, the Bartels received a warranty stating "Beneteau America, Inc. [a predecessor of BGA] . . . warrants to the original purchaser or any subsequent lawful owner" that the Bartels' boat will be free from material defects for certain periods of time.[31]  It further provides that the warranty is valid only if "the mandatory commissioning trial, and the periodic inspections and checks . . . have been accomplished and duly documented by an authorized [Beneteau America, Inc.] dealer or service provider approved in writing by

---

[26] *Id.* ¶¶ 118–25.
[27] *Id.* ¶ 123.
[28] Compl. ¶¶ 124–25.
[29] *Id.* ¶ 8.
[30] *Id.*
[31] Compl. Ex. B (The Bartels' Boat Warranty); Beneteau Mot. Ex. 1 (Certified Articles of Merger showing that Beneteau America, Inc. was merged into BGA).

[Beneteau America, Inc.]"[32] The warranty also contains an arbitration clause, which states in relevant part: "Any disputes arising under or relating directly or indirectly to this contract shall be resolved by binding arbitration pursuant to the American Arbitration Association."[33]

To preserve the validity of the warranty they received, the Bartels had to complete an annual inspection with an authorized dealer.[34] As a result, they paid thousands of dollars out-of-pocket for the required warranty inspection and docking fees.[35] These costs were not disclosed to the Bartels when they purchased their boat.[36]

### E. PROCEDURAL BACKGROUND

On September 27, 2024, Plaintiffs filed the Complaint against Defendants. The Complaint asserts two causes of action: (i) violation of the anti-tying provision of the MMWA (15 U.S.C. § 2302(c)),[37] and (ii) insufficient disclosure of warranty terms under the MMWA (15 U.S.C. § 2302(a)).[38] Plaintiffs' action is styled as a class action asserted on behalf of a putative class of United States consumers who owned boats subject to warranties provided by Defendants.[39]

---

[32] Compl. Ex. B.
[33] *Id.*
[34] Compl. ¶¶ 131–32.
[35] Compl. ¶ 134.
[36] *Id.* ¶ 134.
[37] *Id.* ¶¶ 162–72.
[38] *Id.* ¶¶ 173–83.
[39] *Id.* ¶ 140.

On November 22, 2024, each Defendant filed a motion to dismiss or compel arbitration.[40] The parties submitted briefing on the motions.[41] The Court heard oral argument on February 21, 2025. The matter is ripe for decision.

### III. STANDARD OF REVIEW

#### A. RULE 12(B)(1) MOTION TO DISMISS

On a motion to dismiss for lack of subject matter jurisdiction under Superior Court Civil Rule ("Rule") 12(b)(1), the plaintiff has the burden to show a basis for the Court's exercise of jurisdiction over the action.[42] The Court lacks subject matter jurisdiction over a claim that is properly committed to arbitration.[43] The Court may consider documents beyond the complaint.[44]

#### B. RULE 12(B)(2) MOTION TO DISMISS

When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant."[45] "Absent an evidentiary

---

[40] Beneteau Group America, Inc.'s Mot. Dismiss or, in the Alternative, to Compel Arbitration (D.I. No. 27); Beneteau, S.A.s Mot. to Dismiss or, in the Alternative, to Compel Arbitration (D.I. 28).

[41] Opening Br. Supp. Beneteau Group America, Inc.'s Mot. Dismiss or, in the Alternative, to Compel Arbitration (D.I. No. 27) [hereinafter "BGA's Mot."]; Beneteau's Mot. (D.I. No. 28); Pls.' Opp'n (D.I. No. 53); Omnibus Reply Br. Supp. Defs.' Mots. Dismiss or, In the Alternative, to Compel Arbitration (D.I. No. 62) [hereinafter "Defs.' Reply"].

[42] *Hurtt v. Del Frisco's Rest. Grp.*, 2019 WL 2516763, at *2 (Del. Super. June 18, 2019).

[43] *W. IP Commc'ns, Inc. v. Xactly Corp.*, 2014 WL 3032270, at *5 (Del. Super. June 25, 2014).

[44] *CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2023 WL 2625838, at *5 (Del. Super. Mar. 24, 2023).

[45] *Curam, LLC v. Gray*, 2025 WL 733256, at *4 (Del. Super. Mar. 6, 2025) (internal quotations omitted).

hearing or jurisdictional discovery, the plaintiff need only make a *prima facie* showing that the exercise of personal jurisdiction is appropriate."[46]  In ruling on a Rule 12(b)(2) motion, the Court must "accept all well-pleaded factual allegations as true, unless contradicted by affidavit, and draw all reasonable inferences in favor of the plaintiff."[47]

## C. RULE 12(B)(6) MOTION TO DISMISS

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted,[48] the Court must accept all well-pleaded allegations in the complaint as true.[49]  Even vague allegations are considered well-pleaded if they give the opposing party notice of a claim.[50]  The Court must draw all reasonable inferences in favor of the non-moving party.[51]  Under the plaintiff-friendly pleading standard, dismissal is only appropriate if the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[52]

---

[46] *Wiggins v. Physiologic Assessment Servs., LLC*, 138 A.3d 1160, 1164–65 (Del. Super. 2016).
[47] *Id.*
[48] Del. Super. Ct. Civ. R. 12(b)(6).
[49] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[50] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).
[51] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.
[52] *Windsor I, LLC v. CW Capital Asset Mgmt. LLC*, 238 A.3d 863, 871–72 (Del. 2020) (quoting *In re Gen. Motors*, 897 A.2d at 168).

## IV.  PARTIES' CONTENTIONS

### A. DEFENDANTS' CONTENTIONS

Defendants assert five primary arguments in their motions to dismiss.  First, Defendants argue that Beneteau is not subject to personal jurisdiction in Delaware.[53] According to Defendants, Plaintiffs have not shown that Beneteau directed any conduct at the forum that is related to their claim or that Beneteau is "at home" in Delaware.[54]

Second, Defendants contend that Plaintiffs fail to sufficiently state their claims because they have not alleged any cognizable harm resulting from Defendants' alleged violations under the MMWA.[55]  For the same reason, Defendants argue that Plaintiffs lack standing to pursue their action.[56]

Third, as to Plaintiff Lovett, Defendants posit that the MMWA does not apply extraterritorially, and thus the Act does not cover Lovett's warranty, which was obtained in a transaction abroad.[57]

Fourth, Defendants contend that Plaintiffs can only pursue their claims against the party that provided the warranties.[58]  For Lovett, Defendants maintain that

---

[53] Beneteau Mot. at 6–8.
[54] Defs.' Reply at 1, 4–6.
[55] *Id.* at 10–16.
[56] *Id.* at 17.
[57] *Id.* at 18–22.
[58] *Id.* at 2.

9

neither Defendant provided him a written warranty.[59]  For the Bartels, Defendants contend that only BGA—not Beneteau—provided the warranty for their boat.[60]

Fifth, Defendants move to dismiss the Bartels' claims on the ground that their boat warranty contains a binding arbitration provision.[61]  Defendants cite case law providing that binding arbitration clauses are enforceable under MMWA, despite federal regulations that state the contrary.[62]

## B. PLAINTIFFS' CONTENTIONS

Plaintiffs hold the opposite positions.  First, Plaintiffs maintain that personal jurisdiction over Beneteau is proper in this Court, because Beneteau conducts business in Delaware both directly and through its Delaware subsidiary BGA.[63]

Second, Plaintiffs argue that they have sufficiently pleaded actual damages caused by Defendants' violations.[64]  Plaintiffs maintain that they incurred out-of-pocket costs to use and preserve their warranties.[65]  In addition, they contend that they overpaid for their boats because they are covered by warranties that fail to meet statutory standards.[66]

---

[59] *Id.* at 29.
[60] *Id.* at 32.
[61] *Id.* at 35–36.
[62] Defs.' Reply at 36–38.
[63] Pls.' Opp'n at 8–9.
[64] *Id.* at 36.
[65] *Id.* at 37–38.
[66] *Id.* at 36–37.

10

Third, Plaintiffs contend that the MMWA applies extraterritorially to Lovett's warranty because of the specific circumstances surrounding the purchase.[67]

Fourth, Plaintiffs dispute Defendants' contention that they are not proper parties in the action.[68] Plaintiffs take the position that Beneteau should be deemed a proper party for the claims by all Plaintiffs based on agency law principles and based on the remedial purpose of the Act.[69] And Plaintiffs argue that BGA should be deemed the *functional* warrantor of Lovett's boat.[70]

Finally, Plaintiffs maintain that the arbitration clause contained in the Bartels' warranty is unenforceable, pursuant to the Federal Trade Commission's contemporary interpretations of the MMWA.[71] Plaintiffs further argue that Defendants waived the arbitration clause by previously litigating in a Pennsylvania court for 13 months.[72]

## V. ANALYSIS

### A. ACTUAL DAMAGES AND STANDING

As an initial matter, Defendants contend that neither Lovett nor the Bartels have alleged a cognizable injury, and as a result, Defendants maintain that Plaintiffs

---

[67] *Id.* at 21–29.
[68] *Id.* at 30.
[69] Pls.' Opp'n at 30–35.
[70] *Id.*
[71] *Id.* at 43–53.
[72] *Id.* at 54–56.

(1) fail to plead a requisite element to assert an MMWA claim and (2) lack standing to sustain the action.[73] The Court does not find this argument convincing.

Pursuant to Section 2302(c) of the MMWA, a warrantor is prohibited from "condition[ing] [its] written or implied warranty of such product on the consumer's using, in connection with such product, any article or service … which is identified by brand, trade, or corporate name" unless that article or service is provided without charge.[74] Further, the MMWA provides a right of action to "a consumer who is *damaged* by the failure of a supplier, warrantor, or service contractor to comply with any obligation" under the Act.[75] Reading these provisions in tandem, to sustain their action under the MMWA, Plaintiffs not only must allege a violation of Section 2302(c), but must also allege that they suffered actual damages due to the violation.[76]

Defendants argue that Plaintiffs fail to plead actual damages because they do not allege that their warranty coverage has been declined, or that they had to "pay costs that they would otherwise not be required to pay."[77] Defendants further cite to cases stating that the mere possession of an allegedly improper warranty does not support a cause of action under the MMWA.[78]

---

[73] Defs.' Reply at 10, 17.
[74] 15 U.S.C. § 2302(c); *see* 16 C.F.R. § 700.10.
[75] 15 U.S.C. § 2310(d) (emphasis added).
[76] *See id.*; *Baccellieri v. HDM Furniture Indus., Inc.*, 2013 WL 1088338, at *6 (Del. Super. Feb. 28, 2013) ("Plaintiffs must demonstrate that they were damaged by the failure of [the warrantor] to comply with written or implied warranties").
[77] Def.'s Reply at 12.
[78] Def.'s Reply at 14–18.

Unlike the cases cited by Defendants,[79] Plaintiffs here specifically pleaded the expenses they have incurred to use their warranties or comply with the impermissible "tying provisions" in their warranties. Both Lovett and the Bartels allege that, in order to obtain warranty service from specific providers affiliated with Defendants, they had to wait an unreasonable length of time and, consequently, incurred docking and storage fees.[80] It is further alleged that the Bartels had to pay thousands of dollars out-of-pocket for the required warranty inspection and docking fees when their boat was under repair at an authorized service facility.[81] Contrary to Defendants' contention, these costs are precisely the type that Plaintiffs may avoid if they are not subject to the allegedly illegal tying arrangements in their warranty. Therefore, Plaintiffs sufficiently allege that they sustained actual damages that supports a claim under the MMWA.[82]

For the same reason, Plaintiffs also have standing to ask this Court to adjudicate their claims. Under Delaware law, "standing" refers to a party's right to "invoke the jurisdiction of a court to enforce a claim or redress a grievance."[83] This

---

[79] *E.g. Franzini v. Bissell Homecare, Inc.*, 2024 WL 3366035, at *6 (E.D.N.Y. July 10, 2024); *Ghaznavi v. De Longhi Am., Inc.*, 2023 WL 4931610, at *5 (S.D.N.Y. Aug. 2, 2023).

[80] Compl. ¶¶ 120–138.

[81] Compl. ¶ 134.

[82] In their briefs, the parties also disagree about whether the price-premium theory—the contention that an illegal warranty reduces the value and resale price of a consumer product—is sufficient for pleading damages under the MMWA. *See* Pls.' Opp'n at 38; Defs.' Reply at 12–13. The Court need not reach this issue, because Plaintiffs have pleaded that they incurred out-of-pocket expenses as a result of the allegedly illegal warranties they received.

[83] *Albence v. Higgin*, 295 A.3d 1065, 1085 (Del. 2022).

13

generally requires a plaintiff to show that "(i) the plaintiff has suffered an 'injury-in-fact,' i.e., a concrete and actual invasion of a legally protected interest; (ii) there is a causal connection between the injury and the conduct complained of; and (iii) it is likely the injury will be redressed by a favorable court decision."[84]  Here, Plaintiffs have pleaded that (i) they incurred thousands of dollars of damages (ii) due to the improper warranties their received, and (iii) the injury likely will be redressed by a favorable court decision—compensatory damages.

Accordingly, Plaintiffs have sufficiently alleged that they incurred actual damages and that they have standing to assert this action.

## B. THE MMWA'S EXTRATERRITORIAL APPLICATION TO LOVETT'S CLAIMS

The Court next addresses whether the MMWA applies to Lovett's boat purchase—an extraterritorial transaction.  When applying a federal statute, courts presume that the federal statute applies "only within the territorial jurisdiction of the United States."[85]  This principle—commonly known as the presumption against extraterritoriality—"rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."[86]

---

[84] *Albence*, 295 A.3d at 1086.
[85] *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949).
[86] *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247, 255 (2010).

The U.S. Supreme Court has established a two-step framework for deciding questions regarding extraterritorial application of a federal statute.[87] The first step asks whether the statutory text contains a "clear indication of an extraterritorial application" that rebuts the presumption of extraterritoriality.[88] If not, then the presumption against extraterritoriality controls, and courts move on to the second step.[89] The second step asks the question whether "the case involves a domestic application of the statute."[90] For this step, courts identify the conduct that is the statute's "focus" and determines whether this conduct occurred within the United States.[91] If the conduct occurred domestically, then the case is a permissible domestic application.[92] If not, then the statute is inapplicable.[93]

Applying the two-step inquiry here, the Court concludes that the MMWA does not evince an intent to be applied extraterritorially, nor does this case support a domestic application. Accordingly, Lovett's claims should fail.

*a. The MMWA and Presumption against Extraterritoriality*

The parties have not cited, and the Court has not found any federal appellate courts that has yet addressed the issue of the MMWA's extraterritoriality. The

---

[87] *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018).
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*

15

parties cite to federal district court cases that yielded inconsistent rulings. Plaintiffs cite to *Barnext Offshore Ltd. v. Ferretti Grp. USA, Inc.*, in which the U.S. District Court for the Southern District of Florida held that the MMWA applies extraterritorially to exported goods.[94] Conversely, Defendants argue that *MY. P.I.I., LLC v. Tognum Am., Inc.*, a more recent decision issued by the same federal district court, should govern the analysis in the instant case.[95] In *MY. P.I.I.*, the court departed from the *Barnext* decision and ruled that the MMWA does not apply extraterritorially.[96] This Court finds the *MY. P.I.I.* court's conclusion more persuasive.

In *MY. P.I.I.*, the court observed that the only portion of the MMWA that implicitly or explicitly addresses foreign or extraterritorial application is in its definition of "commerce."[97] The requirements of the MMWA are applied to warranties on consumer products that are "distributed in commerce."[98] The Act defines "distributed in commerce" to mean "sold into commerce, introduced or delivered for introduction into commerce, or held for sale or distribution after introduction into commerce."[99] The term "commerce" is in turn defined as "trade,

---

[94] *See Barnext Offshore Ltd. v. Ferretti Grp. USA, Inc.*, 2011 WL 13223746, at *7 (S.D. Fla. May 16, 2011) (holding that the MMWA applies to a yacht that was manufactured in the United States and exported to and sold in British Virgin Islands).
[95] 2016 WL 7626201, at *3 (S.D. Fla. Mar. 31, 2016).
[96] *MY. P.I.I., LLC v. Tognum Am., Inc.*, 2016 WL 7626201, at *5–6 (S.D. Fla. Mar. 31, 2016).
[97] *Id.* at *3.
[98] 15 U.S.C. § 2301(1).
[99] 15 U.S.C. § 2301(13).

traffic, commerce, or transportation (A) between a place in a State and any place outside thereof, or (B) which affects trade, traffic, commerce, or transportation described in subparagraph (A)."[100]

In *Barnext,* the case upon which Plaintiffs rely, the Southern District of Florida concluded that the MMWA's broad definition of "commerce"—covering commerce "between a place in a State and *any place outside thereof*"[101]—shows the congressional intent to extend the statute extraterritorially.[102]  However, the same court later rejected this interpretation of the statute in *MY. P.I.I.*[103]  In *MY. P.I.I.*, the court pointed out that the MMWA's definition of "commerce" appears to be a boiler-plate language found in many federal statutes.[104]  *MY. P.I.I.* further recognized that the U.S. Supreme Court had refused to find a congressional intent of extraterritorial application in other statutes with similar definitions.[105]  In *E.E.O.C. v. Arabian American Oil Company*, the Supreme Court held that a similar definition of

---

[100] 15 U.S.C. § 2301(14).
[101] *Id.* (emphasis added).
[102] *Barnext Offshore Ltd.*, 2011 WL 13223746, at *6 (stating that "[t]he phrase 'affecting commerce' indicates Congress's intent to regulate to the outer limits of its authority under the Commerce Clause," which would include "commerce with foreign nations").
[103] *MY. P.I.I., LLC*, 2016 WL 7626201, at *4.
[104] *Id.*
[105] *Id.*

"commerce" in Title VII of the Civil Rights Act[106] does not defeat the presumption

of extraterritoriality.[107]  The Supreme Court reasoned:

> Many Acts of Congress are based on the authority of that body to regulate commerce among the several States, and the parts of these Acts setting forth the basis for legislative jurisdiction will obviously refer to such commerce in one way or another.  If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.[108]

Similarly, in *Morrison v. National Australia Bank Ltd.*, the Supreme Court

determined that the definition of "interstate commerce" in the Securities Exchange

Act of 1934 does not rebut the presumption against extraterritoriality.[109]  The

Security Exchange Act defined "interstate commerce" to include "trade, commerce,

transportation, or communication … between any foreign country and any State."[110]

Following the reasoning expressed in *Aramco* and *Morrison*, the *MY. P.I.I.* court

concluded that the MMWA's definition of "commerce" does not evince a clear intent

to apply extraterritorially.[111]  This court agrees.  For those reasons, and because the

---

[106] 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees… ."); 42 U.S.C. § 2000e(g) ("The term 'commerce' means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof… .").
[107] 499 U.S. 244 (1991)
[108] *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 253 (1991) (internal citations omitted).
[109] 61 U.S. 247, 263 (2010).
[110] 15 U.S.C. § 78c(a)(17).
[111] *MY. P.I.I., LLC*, 2016 WL 7626201, at *5.

other parts of the MMWA are silent as to extraterritoriality, the Court concludes that the MMWA does not permit extraterritorial application.[112]

*b. The "Focus" Conduct of the MMWA*

Under the second step of the analysis, the Court determines what conduct constitutes the "focus" of the MMWA, and whether that conduct occurred in the United States.[113] The Court again finds the analysis in *MY. P.I.I.* instructive.

In *MY. P.I.I.*, the Southern District of Florida pointed out that the stated purposes of the MMWA are directed at *the sales* of consumer products: "[T]o improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products… ."[114] Further, the court conducted a thorough analysis of the language of the MMWA and found that: (1) the sale of a product "is the critical event triggering application of the statute"; (2) the Act repeatedly references "the sale" in the provisions directing the FTC to promulgate regulations; and (3) the MMWA's legislative scheme was enacted to protect the consumer's bargain when purchasing a product.[115] Therefore, the *MY.*

---

[112] *See id.*; *see also In re Hill's Pet Nutrition, Inc., Dog Food Prods. Liab. Litig.*, 2022 WL 1641291, at *5 (D. Kan. May 24, 2022) (refusing to apply the MMWA extraterritorially where a citizen of Germany sued an American dog food manufacturer after buying recalled dog foods that was manufactured in the United States and exported abroad.).

[113] *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010).

[114] 15 U.S.C. § 2302(a).

[115] *MY. P.I.I., LLC*, 2016 WL 7626201, at *5–6.

*P.I.I.* court concluded—and this Court agrees—that the "focus" of the Act was the sale of a consumer product to a consumer.[116]

Plaintiffs argue that the application of the MMWA to Lovett's claim "seems logical" because (1) Lovett was a United States resident; (2) Lovett intended to transport his boat to the United States; (3) Lovett planned to use the warranty in the United States, (4) Beneteau represented that the warranty would apply in the United States, and (5) the warranty Lovett received was identical to a warranty that would have been provided to a purchase of an identical boat in the United States.[117] But these domestic connections are irrelevant to the analysis. Plaintiffs admit in the Complaint that the purchase of Lovett's boat—the focus of the statute—occurred abroad.[118] Therefore, the MMWA is inapplicable. Accordingly, Lovett's claims in this action are hereby dismissed.

Having determined that Lovett cannot proceed with this action, the Court will focus on addressing Defendants' arguments pertaining to the claims asserted by the Bartels.

---

[116] *See id.* at *5.

[117] Pls.' Opp'n at 24–25.

[118] Compl. ¶ 113 ("Although Mr. Lovett, an American citizen, purchased the boat abroad, as Defendants encourage its customers to do, he always intended to transport his boat back to the United States.").

## C. BENETEAU IS NOT A PROPER PARTY TO THE BARTELS' CLAIMS

Beneteau argues that it is not liable to the Bartels because it did not provide a written warranty to them and thus, cannot be considered a "warrantor" under the MMWA.[119] The Court agrees that Plaintiffs have not pleaded sufficient facts to support the inference that Beneteau is a warrantor for the Bartels' boat purchase.

Under the MMWA, a "warrantor" is defined as "any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty."[120] A "supplier" means "any person engaged in the business of making a consumer product directly or indirectly available to consumers."[121] Section 2310(f) of the Act further provides that "only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty, and any rights arising thereunder may be enforced under this section only against such warrantor and no other person."[122]

Plaintiffs have failed to allege that Beneteau was the "warrantor" for the warranty received by the Bartels, because nothing in the Complaint or the attached exhibits indicate that Beneteau "actually [made] a written affirmation of fact, promise, or undertaking" to the Bartels.[123] The warranty received by the Bartels

---

[119] Defs.' Reply at 32.
[120] 15 U.S.C. § 2301(5).
[121] 15 U.S.C. § 2301(4).
[122] 15 U.S.C. § 2310(f).
[123] *Id.*

21

states that "Beneteau America, Inc. [a predecessor of BGA] . . . warrants to the original purchaser or any subsequent lawful owner . . . that" the boat purchased by the Bartels will be free from material defects for certain periods of time.[124] The warranty then sets forth the relevant obligations that are owed by *Beneteau America, Inc.*, not *Beneteau, S.A.*[125] The Complaint also does not allege that Beneteau made any written representations in connection with the sale of the Bartels' boat.[126]

Plaintiffs assert several arguments in their answering brief to support their contention that Beneteau is a warrantor under the Bartels' warranty. None of those arguments are convincing. Plaintiffs maintain that Beneteau is liable for a warranty created by BGA under the principles of agency law.[127] However, Plaintiffs do not cite to any case authority that imposes warrantor liability under the MMWA based on an agency-principal relationship.[128] Indeed, Section 2310(f) provides that a consumer may enforce a right arising under the MMWA only against "the warrantor actually making a written affirmation of fact, promise, or undertaking" and "*no other person.*"[129] Therefore, the plain language of the MMWA expressly precludes the imposition of warrantor liability based on Plaintiffs' agency-principal theory.

---

[124] Compl. Ex. B. (The Bartels' Warranty).
[125] *See id.*
[126] *See generally* Compl.
[127] Pls.' Opp'n at 30–32.
[128] *Id.*
[129] 15 U.S.C. § 2310(f) (emphasis added).

22

Plaintiffs argue in the alternative that "[Beneteau], not BGA, offers warranties directly to consumers and is obligated under implied warranties" because it "approves warranty costs, ships replacement parts, and manages the warranty program in the United States."[130] To be sure, the Complaint does contain detailed allegations regarding Beneteau's role in administering warranty services and repairs for BGA.[131] Nonetheless, the MMWA does not impose warrantor liability based on administration of a warranty program or provision of warranty services.[132] Rather, the MMWA expressly limits liability to "the warrantor actually making a written affirmation of fact, promise, or undertaking." The Complaint does not plead that Beneteau made such a written affirmation to the Bartels.

Finally, Plaintiffs argue that Beneteau merely uses BGA as a "pass through" entity to execute its warranty program, and that "[a]llowing [Beneteau] to evade liability through a 'shell company' defense would frustrate the statutory scheme" of the MMWA."[133] This characterization—suggesting BGA is a fictious entity created solely to shield Beneteau from liability—is contradicted by the Complaint itself. The Complaint clearly establishes BGA as a functional business that distributes the

---

[130] Pls.' Opp'n 33–34.
[131] *See* Compl. ¶¶ 73–80.
[132] *See* 15 U.S.C. §§ 2301(5), 2307(providing that a warrantor may designate representatives to perform duties under the written or implied warranty "but no such designations shall ... make the representative a cowarrantor").
[133] Pls.' Opp'n at 34.

boats manufactured by Beneteau in the U.S. and provides warranties for the sales.[134] In addition, the Bartels' warranty explicitly identifies BGA's predecessor as the warrantor, which makes BGA the proper defendant for the Bartels' claims.[135] Given that nothing in the pleadings suggest that Beneteau is a warrantor or co-warrantor to the warranty, declining to impose liability on Beneteau aligns with, rather than frustrates, the MMWA's mandate.[136]

Beneteau is not a proper party for the Bartels' claims. Accordingly, Defendants' Motion to Dismiss is granted as to the Bartels' claim against Beneteau. Because the claims asserted against Beneteau by Lovett and the Bartels have been dismissed for separate, independent reasons, the Court need not rule on Beneteau's lack of personal jurisdiction defense.

### D. ENFORCEABILITY OF THE BINDING ARBITRATION CLAUSE

The Bartels argue that the arbitration clause contained in their warranty is prohibited by the MMWA.[137] They point out that the FTC has determined that an

---

[134] Compl. ¶¶ 25 ("Beneteau S.A., in partnership with other subsidiaries, manufacturers all the boats that BGA sells. BGA then distributes these boats to dealers … ."), 60 ("Beneteau S.A. benefits from [its relationship with BGA] by using BGA as a conduit to American markets and a wholesaler/distributor."), 63 ("Beneteau S.A. manufactures all its boats. It then uses BGA to serve as a distributor to third-party retail dealers, who sells them to consumers and provides aftersales warranty service."), 64 (While the sales are completed by third-party retailers, Defendants provide the warranty for their products. In many instances, American consumers seeking warranty coverage must pay for the repairs out-of-pocket and submit the claims through Beneteau dealers to Beneteau S.A., or to BGA, for payment. BGA then reimburses for these warranty repairs.).
[135] *See* Compl. Ex. A (The Bartels' Warranty)
[136] *See* 15 U.S.C. § 2310(f).
[137] Pls.' Opp'n at 44.

informal dispute settlement procedure provided in a warranty under the MMWA cannot be legally binding.[138] BGA disagrees, and contends that the arbitration clause is enforceable. In support, BGA cites to case law rejecting the FTC's interpretation based on the pro-arbitration presumption created by the Federal Arbitration Act.[139] To properly assess the enforceability of the arbitration clause in question, an overview of the relevant statutes and case authorities is in order.

### a. The MMWA and the FTC Rule

Congress enacted the MMWA in 1975 to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products[.]"[140] The MMWA sets certain standards for written warranties and creates a variety of substantive obligations with which a supplier, warrantor, or service contractor must comply.[141] If a consumer is damaged by a failure of the warrantor to comply with any of the obligations under the MMWA, the consumer may bring suit in either federal court or state court to recover damages.[142]

In addition, the MMWA allows warrantors to establish an "informal dispute settlement mechanism" in a written warranty ("IDSM"), and, if the IDSM meets

---

[138] Pls.' Opp'n at 44–53.
[139] Defs.' Reply at 36–37.
[140] 15 U.S.C. § 2302(a).
[141] 15 U.S.C. § 2301–12.
[142] 15 U.S.C. § 2310(d).

certain requirements, consumers must initially resort to such a mechanism before bringing suit in court.[143] The MMWA also instructs the Federal Trade Commission (the "FTC") to prescribe minimum requirements for an IDSM.[144] The relevant provisions state as follows:

> (1) Congress hereby declares it to be its policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.
> (2) The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this chapter applies. Such rules shall provide for participation in such procedure by independent or governmental entities.
> (3) One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—
> > (A) a warrantor establishes such a procedure,
> > (B) such procedure, and its implementation, meets the requirements of such rules, and
> > (C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,
>
> then (i) the consumer may not commence a civil action (other than a class action) . . . unless he initially resorts to such procedure . . . .[145]

As instructed in the MMWA, the FTC promulgated regulations setting forth the requirements for IDSMs.[146] Among other requirements, the FTC provides in 16

---

[143] 15 U.S.C. § 2310(a).
[144] 15 U.S.C. § 2310(a)(2)–(3).
[145] 15 U.S.C. § 2310(a).
[146] 16 C.F.R. § 703.3–8 (2015).

C.F.R. § 703.5 that "[d]ecisions of the [IDSM] shall not be legally binding on any person." Therefore, according to the FTC rule, the binding arbitration clause in question, which is incorporated into the Bartels' boat warranty, is impermissible under the MMWA.[147] But that does not end the analysis. The key question here is how this rule squares with the mandate of the Federal Arbitration Act (the "FAA").

*b. The Federal Arbitration Act*

The FAA was enacted in 1925 to "reverse centuries of judicial hostility to arbitration agreements," by "placing arbitration agreements upon the same footing as other contracts.[148] The FAA provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The interplay between FAA and other federal statutes has not been always clear, so a review of the genealogy of relevant case law is helpful in understanding how the FAA's policy affects the MMWA. Initially, the FAA was not applied to uphold arbitration when doing so would defeat a statutory cause of action.[149] For example, in the 1953 case *Wilko v. Swan*, the U.S. Supreme Court was asked to

---

[147] *See id.*
[148] *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (cleaned up).
[149] *See Koons Ford of Baltimore, Inc. v. Lobach*, 398 Md. 38, 48 (2007) (surveying U.S. Supreme Court cases to illustrate the evolution of the Federal Arbitration Act).

determine whether an agreement to arbitrate disputes arising under the Securities Act of 1933 was valid.[150] Recognizing that the effectiveness of the Securities Act "is lessened in arbitration as compared to judicial proceedings[,]" the Supreme Court ruled that "the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act."[151]

In the 1980s, however, the Supreme Court began giving more weight to the pro-arbitration policy expressed by the FAA and issued a series of cases that upheld enforceability of agreements to arbitrate statutory actions.[152] In *Shearson/Am. Exp., Inc. v. McMahon*—a 1987 case—the Supreme Court made clear that the FAA, standing alone, "mandates enforcement of agreements to arbitrate statutory claims."[153] While recognizing that the FAA's pro-arbitration mandate "may be overridden by a contrary congressional command," the Supreme Court stated that "burden is on the party opposing arbitration to show that Congress intended to

---

[150] 346 U.S. 427 (1953) (overruled by *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989)).

[151] *Id.* at 435-38.

[152] *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.* 473 U.S. 614, 628 (1985) (holding that "the party should be held to [an agreement to arbitrate] unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue" and that Congress has not evinced such an intent in the Sherman Act); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

[153] *McMahon*, 482 U.S. at 226.

preclude a waiver of judicial remedies for the statutory rights at issue."[154] The *McMahon* Court further reasoned that "[i]f Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes."[155] Applying this test, which has since become commonly known as the *McMahon* test, the Supreme Court held that Congress did not intend to preclude agreements to arbitrate claims arising under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act (RICO).[156]

Following the *McMahon* decision, the Supreme Court overruled *Wilko* in 1989 and held that a predispute agreement to arbitrate claims under the Securities Act of 1933 is enforceable.[157] Since *McMahon*, the U.S. Supreme Court has been reluctant to find that a statute contains sufficiently clear congressional intent to preclude enforcement of arbitration agreements.[158] But the U.S. Supreme Court has not applied this test to assay the FTC's prohibition against binding arbitration under

---

[154] *Id.* at 227.
[155] *Id.*
[156] *Id.* at 242.
[157] *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989).
[158] *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (holding that the Age Discrimination Employment Act does not contain a congressional intent to preclude compulsory arbitration); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (holding that the FAA requires an agreement to arbitrate a Credit Repair Organizations Act claim to be enforced); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 499 (2018) (holding that the National Labor Relations Act does not preclude arbitration agreements providing for individualized proceedings).

the MMWA, nor have any Delaware courts taken up the challenge directly.[159]

Decisions by lower federal courts and other state courts that addressed this issue are

split.[160] Thus, this Court will address the issue head-on.

### c. Congress' Intent to Preclude a Binding Arbitration Clause Incorporated in a Written Warranty

To determine whether the arbitration clause in question is precluded under the

*McMahon* test, the Court must discern Congress's intent based on (1) the plain

language of the MMWA, (2) the legislative history, and (3) any inherent conflict

between arbitration and the MMWA's underlying purpose.[161] The Court believes

that the congressional intent is clear that the clause is precluded.

Both the plain language and the legislative history of the MMWA evince a

clear congressional intent to preclude the binding arbitration provision contained in

the warranty in question.[162] The IDSM provision of the MMWA, contained in 15

U.S.C. § 2310(a), provides that if a written warranty provides procedures for an

---

[159] In *DaimlerChrysler Corp. v. Matthews*, the Court of Chancery was tasked with deciding the enforceability of an agreement to arbitrate claims arising under the MMWA. 848 A.2d 577, 586 (Del. Ch. 2004). The Court of Chancery did not apply the *McMahon* test to the MMWA, but instead invalidated the arbitration agreement on another ground. *See id.* (holding that the arbitration agreement violated the FTC's one-document rule because it was not incorporated into the written warranty).

[160] *Compare, e.g., Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir. 2002) (upholding binding arbitration); *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470 (5th Cir. 2002) (same); and *Patriot Mfg., Inc. v. Jackson*, 929 So. 2d 997, 1005-06 (Ala. 2005) (same) *with, e.g., Rickard v. Teynor's Homes, Inc.*, 279 F. Supp. 2d 910 (N.D. Ohio 2003) (rejecting binding arbitration); *Koons Ford of Baltimore, Inc. v. Lobach*, 919 A.2d 722 (Md. 2007) (same); and *Parkerson v. Smith*, 817 So. 2d 529 (Miss. 2002) (same).

[161] *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

[162] *Id.*

IDSM that meets the FTC's rules, then "the consumer may not commence a civil action . . . *unless he initially resorts to such procedure*[.]"[163]  As the FTC explained in its 1999 rule review, "[t]his language clearly implies that [an IDSM]'s decision cannot be legally binding, because if it were, it would bar later court action."[164]  This Court agrees.  Congress could not have intended the IDSM to be a "first resort" procedure that *permits* subsequent action in court once exhausted, while simultaneously intending the procedure to *foreclose* litigation.  Therefore, the language of Section 2310(a) indicates that Congress intended an IDSM to be non-binding.

This understanding is further bolstered by the MMWA's legislative history.  The House Report on the Act states that "[a]n adverse decision in any informal dispute settlement procedure would not be a bar to a civil action on the warranty

---

[163] 15 U.S.C. § 2310(a)(3) (emphasis added).

[164] 64 Fed.Reg. 19700, 19708 (April 22, 1999).  It is worth noting that the courts that have addressed this issue prior to 2024 were subjected to the *Chevron* deference standard, pursuant to which courts are bound by an agency's interpretation of an ambiguous statute as long as the interpretation is reasonable.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  In 2024, the U.S. Supreme Court eliminated the *Chevron* deference in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  After the *Loper Bright* decision, the standard commonly known as *Skidmore* deference reclaims its position as the applicable standard in addressing agency interpretation.  *See Loper Bright Enters.*, 603 U.S. at 393.  Under that standard, agency interpretations, while not binding on courts, "constitute a body of experience and informed judgment" that may be "entitled to respect." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  The weight assigned to an agency's judgment would "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

involved in the proceeding[.]"[165]  In addition, the MMWA's Senate Conference

Report states that if a consumer chooses to seek redress without using the IDSM

established pursuant to the statute, the consumer may still pursue "all alternative

avenues of redress."[166]

Even though the MMWA clearly intends an ISDM to be non-binding, some

courts have upheld binding arbitration provisions contained in written warranties

governed by the MMWA.[167]  These courts often point to the fact that the MMWA

does not expressly address "arbitration."[168]  The U.S. Court of Appeals for both the

Fifth Circuit and the Eleventh Circuit have held that the MMWA's text and

legislative history do not manifest a sufficiently clear intent to overcome the FAA's

presumption in favor of arbitration.[169]  In *Walton v. Rose Mobile Homes LLC*, the

Fifth Circuit stated that the MMWA "does not specifically address binding

arbitration, nor does it specifically allow the FTC to decide whether to permit or to

ban binding arbitration."[170]  The Fifth Circuit acknowledged in *Walton* that the

MMWA intends an IDSM established pursuant to Section 2310(a) to be non-

---

[165] H.R. Rep. No. 93–1107 (1974), reprinted in 1974 U.S.C.C.A.N. 7702, 7723.
[166] S. Conf. Rep. No. 93–1408 (1974), reprinted in 1974 U.S.C.C.A.N. 7755, 7758.
[167] *See, e.g., Walton v. Rose Mobile Homes LLC*, 298 F.3d 470 (5th Cir. 2002); *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir. 2002).
[168] *See Davis*, 305 F.3d 1268 (concluding that "Congress failed to directly address binding arbitration anywhere in the text or legislative history of the MMWA"); *see also In re Am. Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 487 (Tex. 2001) ("The Magnuson–Moss Act does not expressly prohibit binding arbitration. In fact, the Magnuson–Moss Act does not mention arbitration.").
[169] *Walton*, 298 F.3d 470 (5th Cir. 2002); *Davis*, 305 F.3d 1268 (11th Cir. 2002).
[170] *Walton*, 298 F.3d at 475.

binding.[171]  However, the Fifth Circuit determined that the MMWA's reference to "informal dispute resolution procedure" ("IDSM") does not cover binding arbitration in its scope because "binding arbitration is not normally considered an informal procedure."[172]

Similarly, in *Davis v. Southern Energy Homes, Inc.*, the Eleventh Circuit stated that "Congress failed to directly address binding arbitration anywhere in the text or legislative history of the MMWA."[173]  The *Davis* court therefore followed *Walton*'s reasoning and found that the presence of the IDSM provision "does not mean that the Act precludes a court from enforcing a valid binding arbitration agreement."[174]  According to *Davis* and *Walton*, because the MMWA does not directly reference arbitration, and because arbitration is not often considered an informal procedure, Congress did not intend arbitration to be covered by the IDSM provision or its "non-binding" requirement.[175]

That reliance on the lack of express reference to "arbitration" is unconvincing, for two reasons.  First, Congress left the term "informal dispute settlement procedure" undefined in the MMWA, and specifically designated the FTC to set forth the "minimum requirements" for any such procedure.[176]  A more compelling

---

[171] *Id.* at 476 .
[172] *Id.*
[173] *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1278 (11th Cir. 2002).
[174] *Davis*, 305 F.3d at 1275.
[175] *See Davis*, 305 F.3d at 1275–76; *Walton*, 298 F.3d at 476.
[176] 15 U.S.C. 2310(a).

reading is that Congress did not intend to limit "informal dispute settlement procedure" to certain types of procedures, but instead left the FTC to prescribe the substantive requirements for such procedure, no matter what *form* it takes.[177] It thus does not necessarily follow that the IDSM provision's lack of reference to a specific form of procedure should be interpreted as an intent to *exclude* that form from its scope.

Second, Congress enacted the MMWA in 1975, before the U.S. Supreme Court issued the series of decisions articulating that the FAA's policy applies to arbitration agreements that would displace statutory claims. When the MMWA was enacted, *Wilko*—which invalidated an agreement to arbitrate because it undermines a party's statutory rights—was still the precedent.[178] Therefore, the Congress that drafted the MMWA was not alerted to a need to specifically address "arbitration" in drafting a statute that may restrict use of arbitration.[179]

---

[177] *See id.*

[178] 346 U.S. 427 (1953)

[179] *See Koons Ford of Baltimore, Inc. v. Lobach*, 398 Md. 38, 62 (2007) ("Because arbitration was a precursor to litigation in 1975 and the precedent at the time that Congress enacted the MMWA was that arbitration disadvantaged the consumer, we hold that Congress did not intend for consumers to be forced to resolve their MMWA claims through binding arbitration, as it stands today."); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 104 n.4 (2012) (finding that claims under the Credit Repair Organizations Act (the "CROA") are arbitrable, and noting that the CROA, enacted in 1996, "followed a series of this Court's seminal decisions compelling arbitration, decisions which held that the FAA had established a federal policy favoring arbitration" (internal quotations omitted)).

The Court also disagrees with the proposition that, because binding arbitration is "not normally considered to be an *informal dispute settlement procedure*," the IDSM provision is not meant to restrict binding arbitration.[180] Even if arbitration is considered relatively formal by modern standards, it is unclear how arbitration was perceived in the 1970s, when Congress enacted the MMWA. As Chief Judge King pointed out in her dissent in *Walton*:

> As numerous commentators have recognized, the formality of arbitration proceedings has increased notably in the latter half of the twentieth century, particularly in the period since the Supreme Court "revitalized" the FAA by clarifying its applicability to statutory claims in the late 1980s. Moreover, even today, arbitration undoubtedly constitutes a more "informal" procedure than litigation. Thus, to categorize arbitration as "formal" or "informal" largely begs the question of the appropriate basis of comparison. Under these circumstances, even if the majority is correct that most people would characterize arbitration as a "formal" procedure at this point in time, this perception hardly provides conclusive evidence that the 1974 Congress did not intend to address arbitration proceedings in enacting MMWA provisions governing "informal dispute resolution proceedings."[181]

Similarly, the FTC explained in its 2015 rule review that "any arbitration proceeding is, by comparison to judicial proceedings, an 'informal' 'mechanism' for 'dispute settlement,' and it thus falls squarely within the plain meaning of the term 'informal dispute settlement mechanism.'"[182] Therefore, the formal-informal distinction does

---

[180] *Walton*, 298 F.3d at 476 (5th Cir. 2002) (internal quotation omitted) (emphasis added).
[181] *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 484–85 (5th Cir. 2002) (King, C.J., dissenting) (internal citations omitted) (collecting scholarly articles).
[182] 80 Fed.Reg. 42710, 42719 (2015).

not militate toward a finding that Congress intended to leave "arbitration" out of the scope of the IDSM provision.[183]

Moreover, to carve out "arbitration" from the term "informal dispute settlement mechanism" would effectively defeat the purpose of the IDSM provision. As the FTC aptly explained in its 2015 rule review:

> To effectuate its declared policy of encouraging IDSMs that "fairly and expeditiously" settle consumer disputes, Congress: (1) Created incentives for warrantors to develop IDSMs and (2) directed the [FTC] to issue and enforce baseline rules for IDSMs. Congress would not have created this elaborate structure for warrantor incentives and agency supervision of warrantors who want to mandate use of certain contractual procedures in their warranties, while *simultaneously permitting warrantors to evade that structure* simply by using another

---

[183] In *Harrison v. Nissan Motor Corp. in U.S.A.*, the Third Circuit was asked to review a district court's denial of a motion to dismiss. The appellant-defendant moved to dismiss in the trial court based on the plaintiff's failure to resort to an informal dispute resolution procedure provided by the defendant pursuant to the Pennsylvania Lemon Law and the MMWA. 111 F.3d 343, 345 (3d Cir. 1997). The appellant-defendant argued that the Third Circuit had jurisdiction to hear the interlocutory appeal under the FAA because the motion to dismiss was equivalent to a motion to compel arbitration under the FAA. *Harrison v. Nissan Motor Corp. in U.S.A.*, 111 F.3d 343, 345 (3d Cir. 1997). The Third Circuit dismissed the appeal, holding that the informal dispute resolution procedure provided by the defendant was not within the meaning of "arbitration" as contemplated by the FAA. *See id.* In so holding, the Third Circuit stated in passing that "[i]f the drafters [of the MMWA] had intended [an informal dispute resolution procedure] to be cognizable under the FAA, then it is likely that they would have referred to it as 'arbitration.'" *Id.* at 351.

The Supreme Court of Illinois seized on this language and concluded that "the Third Circuit cast doubt upon the FTC's ruling that informal dispute resolution procedures include arbitration." *Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 397 (2004). This conclusion overstated *Harrison*'s holding. *Harrison* involved a question of whether an order involving a non-binding IDSM falls within the appellate jurisdiction provided by the FAA. 111 F.3d 343, 345 (3d Cir. 1997). In addressing this specific question, the *Harrison* court held that the parties "did not enter into a contract to arbitrate their dispute within the meaning of the FAA," even if the parties were subject to an IDSM established pursuant to the MMWA. *Id.* at 351. According to *Harrison*, there is no indication that Congress and the FTC, by virtue of enacting the MMWA and related regulations, had intended all IDSMs established pursuant to the MMWA to be automatically encompassed within the ambit of the FAA. *See id. Harrison* does not stand for the proposition that the MMWA's IDSM provision cannot cover an arbitration proceeding.

contractual procedure and calling it something else (e.g., "binding arbitration") and thereby immunizing it from all agency oversight.[184]

Unlike the statutes that the U.S. Supreme Court has found to not overcome the FAA's pro-arbitration policy,[185] the MMWA devises a deliberate framework that governs the use of alternative dispute resolution mechanisms.[186] The framework incentivizes warrantors to establish IDSMs in written warranties by requiring consumers to first resort to those procedures. In turn, an IDSM must implement the safeguards devised by the FTC and must not bar other forms of redress. Through this framework, the MMWA balances Congress' interest in protecting consumers from unfair written warranties, on the one hand, and the interest in facilitating expeditious settlement of warranty disputes, on the other. Enforcing a binding arbitration provision in a warranty would disrupt this balance and subvert the statutory scheme.

Some courts have concluded that the FTC's prohibition of binding IDSMs is based in the type of "hostility" or "skepticism" toward arbitration that contravenes

---

[184] 80 Fed.Reg. 42710, 42719 (2015) (emphasis added).
[185] *Mitsubishi Motors Corp.*, 473 U.S. 614 (1985) (the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1–7 (2005)); *Rodriguez de Quijas*, 490 U.S. 477 (1989) (the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*); *McMahon*, 482 U.S. 220 (1987) (the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the RICO Act, 18 U.S.C. §§ 1961–1968); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) (the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012) (the CROA, 15 U.S.C. § 1679a); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) (the National Labor Relations Act, 29 U.S.C. §§ 151–169).
[186] *See* 15 U.S.C. 2310(a).

federal policy favoring arbitration.[187]  Not so.  Notably, the FTC's rule does not contemplate a blanket ban of arbitration.  Indeed, both the statute and the FTC's rules *encourage* the use of IDSMs, including arbitration proceedings, as long as they meet the minimum requirements promulgated by the FTC and are not legally binding.[188]  Moreover, the parties are free to enter into an agreement to arbitrate an MMWA claim *after* a dispute arises.[189]  The FTC's rule only prohibits binding arbitration where it is incorporated into the terms of a written warranty, which puts it under the reign of the IDSM provision.[190]  This prohibition does not reflect a belief that arbitration is an inherently inadequate forum.  Rather, it is rooted in the statutory language indicating that an IDSM should be a prerequisite—not a bar—to subsequent litigation.[191]

---

[187] *See, e.g., Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1279 (11th Cir. 2002); *Cervalin v. Universal Glob., Inc.*, 2021 WL 2793593, at *6 (N.J. Super. Ct. App. Div. July 6, 2021).

[188] 15 U.S.C. 2310(a); *see also* 80 Fed.Reg. 42710, 42719 (July 20, 2015); *Browne v. Kline Tysons Imports, Inc.*, 190 F. Supp. 2d 827, 831 (E.D. Va. 2002) ("A clear reading of the statute evinces Congress's intent to encourage informal dispute settlement mechanisms, yet not deprive any party of their right to have their written warranty dispute adjudicated in a judicial forum.").

[189] *See* 80 Fed.Reg 42710, 42719 (July 20, 2015).  In *In re Am. Homestar of Lancaster, Inc.*, the Supreme Court of Texas stated that "the FTC's position about binding arbitration has been less than consistent."  50 S.W.3d 480, 491 (Tex. 2001).  That Court based this argument on the fact that the FTC encouraged warrantors and consumers to agree to binding arbitration.  50 S.W.3d 480, 491 (Tex. 2001) (citing the FTC's statement that "*nothing in the rule precludes the parties from agreeing to use some avenue of redress* other than the mechanism if they feel it is more appropriate").  This argument fails to appreciate the difference between a binding arbitration provision *incorporated into a warranty*, which is governed by the IDSM provision, and a binding arbitration agreement that parties voluntarily negotiate and execute after a dispute arise, which is not.  The FTC has been consistent in its position that the MMWA prohibits the former but encourages the latter. 40 Fed.Reg. 60168, 60210–11 (December 31, 1975); 64 Fed.Reg. 19700, 19708 n. 70 (April 22, 1999); 80 Fed.Reg. 42710, 42719 (July 20, 2015).

[190] *See id.*

[191] *See* 15 U.S.C. 2310(a).

Therefore, the binding provision in the Bartels' warranty is unenforceable under the MMWA, and the Court will exercise subject matter jurisdiction over their claims.[192]

## VI. CONCLUSION

For the foregoing reasons, Defendant Beneteau's motion is **GRANTED**. Defendant BGA's motion is **GRANTED** as to the claims asserted by Lovett and **DENIED** as to the claims asserted by the Bartels and **DENIED** as to the request to compel arbitration.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[192] Because the arbitration provision is unenforceable, the Court need not address the waiver argument.